VANCE, SECRETARY OF STATE, ET AL. *v.* BRADLEY
ET AL.

No. 77–1254.  Argued November 27, 1978—Decided February 22, 1979

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, BLACKMUN, POWELL, REHNQUIST, and STEVENS, JJ., joined. MARSHALL, J., filed a dissenting opinion, *post*, p. 112.

*Solicitor General McCree* argued the cause for appellants. With him on the brief were *Assistant Attorney General Babcock, Leonard Schaitman, Neil H. Koslowe, Herbert J. Hansell,* and *Michael A. Glass.*

*Zona F. Hostetler* argued the cause for appellees. With her on the brief was *Bruce J. Terris.**

MR. JUSTICE WHITE delivered the opinion of the Court.

The issue presented is whether Congress violates the equal protection component of the Fifth Amendment's Due Process Clause [1] by requiring retirement at age 60 of federal employees

---

*Catherine Waelder* filed a brief for the American Foreign Service Assn. as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Alfred Miller* for the American Association of Retired Persons; by *William J. Mahannah* and *L. M. Pellerzi* for the American Federation of Government Employees (AFL–CIO); by *Claude Pepper, pro se,* and *Edward F. Howard* for Claude Pepper et al.; and by *Howard Eglit, Mark Shenfield,* and *David Marlin* for the National Council of Senior Citizens.

[1] Concern with assuring equal protection was part of the fabric of our Constitution even before the Fourteenth Amendment expressed it most

covered by the Foreign Service retirement and disability system but not those covered by the Civil Service retirement and disability system. A three-judge District Court was convened to hear this challenge to the constitutionality of a federal statute by appellees, a group of former and present participants in the Foreign Service retirement system. Treating the case as submitted on cross motions for summary judgment, the District Court examined the affidavits and allegations presented by both sides, held the distinction invalid, and gave judgment for appellees. 436 F. Supp. 134 (DC 1977).[2] We noted probable jurisdiction, 436 U. S. 903 (1978), and now reverse.

## I

The statutory provision under attack, § 632 of the Foreign Service Act of 1946, 60 Stat. 1015, as amended, 22 U. S. C. § 1002, mandates the retirement at age 60 of participants in the Foreign Service retirement system.[3] That system orig-

---

directly in applying it to the States. See Cong. Globe, 39th Cong., 1st Sess., 2510 (1866) (Rep. Miller) (all of § 1 of the Fourteenth Amendment is already within the spirit of the Declaration of Independence); *id.,* at 2459 (Rep. Stevens) (requirement of equal protection is part of Constitution but is not applicable to the States); *id.,* at 1034 (Rep. Bingham, speaking of his original proposal for an equal protection clause) ("[e]very word of the proposed amendment is to-day in the Constitution"). Accordingly, the Court has held that the Due Process Clause of the Fifth Amendment forbids the Federal Government to deny equal protection of the laws. *E. g., Hampton* v. *Mow Sun Wong,* 426 U. S. 88, 100 (1976); *Buckley* v. *Valeo,* 424 U. S. 1, 93 (1976); *Weinberger* v. *Wiesenfeld,* 420 U. S. 636, 638 n. 2 (1975); *Bolling* v. *Sharpe,* 347 U. S. 497, 500 (1954).

[2] Appellees also urged in the District Court that the mandatory retirement age violated the Age Discrimination in Employment Act of 1967, 29 U. S. C. § 633a, an Executive Order, and Civil Service regulations. A single District Judge rejected these nonconstitutional claims, *Bradley* v. *Kissinger,* 418 F. Supp. 64 (DC 1976), and no appeal was taken. Appellees abandoned their other nonconstitutional claims. See 436 F. Supp., at 135 n. 1.

[3] Participation in the system is defined by 22 U. S. C. § 1063. Recently, an average of 44 employees per year have been mandatorily retired.

inally covered only Foreign Service officers in the State Department, but it has been expanded to include Foreign Service Reserve officers with unlimited tenure,[4] career Foreign Service Staff officers and employees,[5] Foreign Service Information officers and career staff in the International Communication Agency,[6] and certain employees of the Agency for International Development.[7] Unlike these employees, personnel covered by the Civil Service retirement system presently face no mandatory retirement age [8] and, when this suit was brought, were not required to retire until age 70.[9]

Appellees have not suggested that the statutory distinction between Foreign Service personnel over age 60 and other federal employees over that age [10] burdens a suspect group or

[4] § 16, 82 Stat. 814.

[5] §§ 501 (a), 522 (a)–(c), 90 Stat. 834, 846–847. See also, § 31 (b), 74 Stat. 838 (including those with 10 years of continuous service).

[6] 82 Stat. 812.

[7] § 16, 87 Stat. 722–723.

[8] Age Discrimination in Employment Act Amendments of 1978, § 5 (c), 92 Stat. 191.

[9] 5 U. S. C. § 8335, which was repealed by the Age Discrimination in Employment Act Amendments of 1978, § 5 (c), 92 Stat. 191.

[10] Since the age factor is present in both groups, the gravamen of appellees' claim, as it developed, was that § 632 discriminates on the basis of job classification. The District Court originally stated in a footnote that, besides the distinction between Foreign Service and Civil Service personnel, appellees "also claim section 632 discriminates between those who have reached age sixty and those who are younger." In response to appellants' complaint that no such issue was in the case, appellees "stressed that [they were] eschewing any such claim in this case and claiming only that Foreign Service employees were being forced to retire without a rational basis at an earlier age than government employees generally." Plaintiffs' Memorandum of Points and Authorities in Response to Defendants' Motion for Reconsideration 4 (July 21, 1977). The District Court accepted appellees' invitation to remove from its opinion the sentence and accompanying discussion, expressly finding that the contention had been abandoned. Order of July 28, 1977. See also Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss

a fundamental interest; and in cases where these considerations are absent, courts are quite reluctant to overturn governmental action on the ground that it denies equal protection of the laws.[11] The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process[12] and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted. Thus, we will not overturn such a statute unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational. The District Court and the parties are in agreement that whether § 632 violates equal protection should be determined under the standard stated in *Massachusetts Board of Retirement* v. *Murgia,* 427 U. S. 307 (1976), and similar cases; and thus that the section is valid if it is "rationally related to furthering a legitimate state interest." *Id.,* at 312.

In arguing that § 632 easily satisfies this standard, the appellants submit that one of their legitimate and substantial goals is to recruit and train and to assure the professional competence, as well as the mental and physical reliability, of the corps of public servants who hold positions critical to our foreign relations, who more often than not serve overseas, frequently under difficult and demanding conditions, and who must be ready for such assignments at any time. Neither the District Court nor appellees dispute the validity of this goal.

---

or, in the Alternative, for Summary Judgment 4 (Nov. 24, 1976); Brief for Appellees 77; Tr. of Oral Arg. 20–22, 24.

[11] *E. g., San Antonio School Dist.* v. *Rodriguez,* 411 U. S. 1, 40 (1973).

[12] Congress' recent action with respect to mandatory retirement ages shows that the political system is working. See n. 8, *supra,* and accompanying text. Indeed, the House preserved the Foreign Service provision, at least for the time being, to allow the appropriate international relations committee to study the issue. 123 Cong. Rec. 30556 (1977).

The appellants also submit that compulsory retirement at age 60 furthers this end in two principal ways: first, as an integral part of the personnel policies of the Service designed to create predictable promotion opportunities and thus spur morale and stimulate superior performance in the ranks; second, by removing from the Service those who are sufficiently old that they may be less equipped or less ready than younger persons to face the rigors of overseas duty in the Foreign Service. The District Court rejected each of these latter submissions and in our view erred in each instance.

## II

At least since the enactment of the Rogers Act in 1924, which created the Foreign Service by reorganizing the diplomatic and consular services into a single entity, Congress has recognized the distinctive requirements associated with the conduct of the country's foreign relations and has provided personnel policies for the Foreign Service separate and apart from the general Civil Service system. Among other differences, Foreign Service officers have been subject to an earlier retirement age than is true in the Civil Service.

Congress continued to give special attention to the Foreign Service when it passed the Foreign Service Act of 1946, 60 Stat. 999, which, with amendments, is still in effect. That Act reorganized the Foreign Service, provided it with a new personnel structure, and revised its retirement system. The intention was to produce a "disciplined and mobile corps of trained men . . . through entry at the bottom on the basis of competitive examination and advancement by merit to positions of command." H. R. Rep. No. 2508, 79th Cong., 2d Sess., 1 (1946).[13] In furtherance of "the fundamental career

---

[13] The Senate Report's general discussion of the Act is identical to that of the House Report. Cf. S. Rep. No. 1731, 79th Cong., 2d Sess., 1–10 (1946).

principle"[14] that had earlier been established for the Service, *id.*, at 5, Congress found that "[t]he promotion system must insure the rapid advancement of men of ability to positions of responsibility and the elimination of men who have reached their ceilings of performance." *Id.*, at 2–3. Thus, not only was initial selection to be on the basis of merit but Foreign Service officers were also to be classified based on their individual abilities and to be regularly examined for promotion by selection boards. Those officers failing to measure up to the performance expected for their class or who had failed to win promotion within an allotted time were "selected out." The aim was to stimulate superior performance and to retain only those capable of conducting themselves in this manner in widely different assignments around the world.

It was also in 1946 that the compulsory retirement age for most classes of Foreign Service officers was lowered from 65 to 60. This provision, § 632, was grouped with the selection-out sections of the Act.[15] Together these sections "prescribe the

---

[14] Accord, H. R. Rep. No. 229, 84th Cong., 1st Sess., 2 (1955) (emphasizing the career concept); 101 Cong. Rec. 3554 (1955) (Rep. Richards) ("The Foreign Service is a career service that a man enters at the bottom and works his way up. When the Committee on Foreign Affairs wrote the Foreign Service Act of 1946 which the Congress adopted, that principle was stressed"). Even when it occasionally found it necessary to make lateral entry easier, Congress emphasized that it still preferred to have "expansion take place over a period of years by the admission to the Foreign Service of applicants in the lower classifications." S. Rep. No. 127, 84th Cong., 1st Sess., 8 (1955); accord, *id.*, at 10 (statement of Deputy Under Secretary of State Henderson) (State Department would also prefer to have entrance be through the junior level); Hearings before the House Committee on Foreign Affairs on H. R. 4941, 84th Cong., 1st Sess., 45 (1955) (Rep. Williams) (recognizing policy of "entry at the bottom and working up on the merit basis").

[15] Of those now subject to § 632, only Foreign Service Staff officers and employees are not also subject to selection out. Staff personnel covered by § 632, however, are expected to be career employees, and thus it is rational to presume for them as well that mandatory retirement would

criteria as to length of service in classes which will determine whether officers are selected out or retired," H. R. Rep. No. 2508, *supra*, at 90, and were designed "to assure a reasonable pyramid of promotion." *Ibid.* The retirement and selection-out provisions are part of an integral plan to create "a correctly balanced Service that [was] constructed so that the size of the various classes would correspond with the distribution of the work load of the Service." *Ibid.* Selection out operates primarily at the lower levels of the Service; compulsory retirement operates at the top of the pyramid. Congress in 1946 required officers in the then-highest category,[16] career ministers, and in the next-highest, class 1, to retire at ages 65 and 60, respectively. These officers were not subject to selection out by the 1946 Act,[17] but as Congress expressly noted with respect to class 1, "the mandatory provisions of the retirement for age . . . accomplish the desired result of insuring turn-over in this class." *Id.*, at 91.[18]

The District Court nevertheless rejected this justification for § 632, stating in conclusory fashion that "recruiting and promoting younger people solely because of their youth is inherently discriminatory and cannot provide a legitimate basis for the statutory scheme." 436 F. Supp., at 136. Whether or not this is a sound legal proposition, we think that the

---

create room at the top and have the resulting ripple effect down through the ranks.

[16] Congress later created an even higher category of "career ambassadors." Pub. L. 250, §§ 4–9, 69 Stat. 537.

[17] Congress in 1955 made class 1 officers subject to the selection-out process as well, § 7, 69 Stat. 25–26, but nothing in the legislative history of that amendment indicates any reversal of the position that most of the involuntary vacancies in the higher ranks would have to be through mandatory retirement.

[18] As Congress described the system, "[m]ost separations should occur near the top (for age or through voluntary retirement) or at the bottom, while the number of men selected out in the middle classes and at middle ages would be limited." H. R. Rep. No. 2508, 79th Cong., 2d Sess., 90 (1946).

District Court mischaracterized the purpose of § 632 and the manner in which it operates. Congress was intent not on rewarding youth *qua* youth, but on stimulating the highest performance in the ranks of the Foreign Service by assuring that opportunities for promotion would be available despite limits on the number of personnel classes and on the number of positions in the Service. Aiming at superior achievement can hardly be characterized as illegitimate, and it is equally untenable to suggest that providing promotion opportunities through the selection-out process and through early retirement does not play an acceptable role in the process. As this Court has previously observed with respect to the selection-out structure provided by Congress for naval officers, which was the model for the Foreign Service Act of 1946, the scheme "results in a flow of promotions commensurate with the Navy's current needs and serves to motivate qualified commissioned officers to so conduct themselves that they may realistically look forward to higher levels of command." *Schlesinger* v. *Ballard,* 419 U. S. 498, 510 (1975).

The District Court also rejected this justification for § 632 because "there is no obvious reason why [it] would not equally apply to the Civil Service." 436 F. Supp., at 136. But this criticism ignores the evident congressional conviction that the country should be at great pains to assure the high quality of those occupying positions critical to the conduct of our foreign relations in the post-war world.[19] Congress plainly intended

---

[19] See 65 Cong. Rec. 7564–7565 (1924) (remarks of Rep. Rogers quoted in text, *infra,* at 104) (Foreign Service positions are often "of prime importance to the United States"); 101 Cong. Rec. 3562 (1955) (Rep. Judd) ("The first responsibility of a good government is to safeguard the security of the nation. The first line of defense in achieving this first objective . . . is our diplomatic corps and those who direct and back it up in the Department of State"); *id.,* at 3560 (Rep. Bentley) ("Because of the duties and responsibilities they undertake, because of the services they render to American individuals and American business interests, because of their vital role in the conduct of our foreign policy, we in the Congress

to create a relatively small, homogeneous, and particularly able corps of Foreign Service officers. It was thought that the tasks performed by this corps were sufficiently demanding and important to the Nation that it was necessary to pursue more rigorous policies to ensure excellence than those generally applicable in the Government. There is no selection-out system in the Civil Service, for example; the competitive examination process is not generally as rigorous; and there are far wider variations in the nature of the various Civil Service positions and personnel. Perhaps Congress will someday attempt to devise a regime such as this one for all federal employees, but for now it has determined to employ it only in connection with what it deems to be a few distinctive groups such as the Foreign Service. See also Civil Service Reform Act of 1978, Pub. L. 95–454, §§ 3 (6), 401–415, 92 Stat. 1113, 1154–1179 (creating Senior Executive Service). The judgment that the Foreign Service needs such a system more than do many other departments is one of policy, and this kind of policy, under our constitutional system, ordinarily is to be "fixed only by the people acting through their elected representatives." *Firemen* v. *Chicago, R. I. & P. R. Co.*, 393 U. S. 129, 138 (1968). Since the congressional judgment to place a high value on the proper conduct of our foreign affairs can hardly be said to be constitutionally impermissible, it was not for the District Court to refuse to accept it.[20]

---

should demand that the service be attractive enough to get the highest type of American men and women into its ranks"); *id.*, at 3559 (Rep. Vorys) (Foreign Service must compete successfully with other Government agencies and private businesses to get the best persons to serve overseas). When Congress added to the Foreign Service retirement system certain personnel in what is now the International Communication Agency, it found that those employees are involved in a "vital activity" and should be subject "to the same stringent judgment of performance as Foreign Service officers." 22 U. S. C. §§ 1223 (a) and (e).

[20] Appellees also argue that however desirable it is to create promotion opportunities it is arbitrary to impose the burden only on those over

# III

The appellants also submit that the Foreign Service involves extended overseas duty under difficult and often hazardous conditions and that the wear and tear on members of this corps is such that there comes a time when these posts should be filled by younger persons. Mandatory retirement, it is said, minimizes the risk of less than superior performance

---

age 60. It would be better, they say, to make the selection-out standards more demanding or in some other way to avoid the retirement of those who are over 60 but quite able to perform. Even were it not irrelevant to the equal protection analysis appropriate here that other alternatives might achieve approximately the same results, the compulsory retirement age assures room at the top at a predictable time; those in the ranks know that it will not be an intolerable time before they will have the opportunity to compete for maximum responsibility.

In designing this unified personnel scheme in 1946, Congress presumed that those in the highest classes would be close to or over age 60, H. R. Rep. No. 2508, *supra* n. 18, at 91, that those in the next two highest categories would be between 45 and 55, *id.*, at 92, and that those in the next two ranks down would be quite young. *Id.*, at 93. These presumptions are hardly irrational in a system designed with the intention that most personnel would begin their professional careers at the bottom of the Service and move upward with time. See *id.*, at 5; n. 14, *supra*. Thus, those who have reached age 60 are likely to have achieved the top ranks of the Service, and their departures usually will have a domino effect creating opportunities at each lower level.

Moreover, appellees have not shown that their alternative would be any less arbitrary than they think the present system is. As Congress recognized, selection out works best at the lower ranks where differences in merit are the greatest. See H. R. Rep. No. 229, *supra* n. 14, at 12. At the top ranks, where the officers have all been selected up a number of times, it is increasingly difficult to try to draw fine distinctions between persons who may all be extremely competent. And because Congress decided to grant annuities to those in the upper categories who are selected out after having dedicated much of their lives to the service, it found that "the system should be administered to reduce to a minimum the number of separations of middle-aged men, not only because of the hardship on them, but because of the expense to the Government." H. R. Rep. No. 2508, *supra* n. 18, at 92.

by reason of poor health or loss of vitality. In this respect, the appellants accurately reflect the legislative record, which without doubt articulates both the purpose of maintaining a competent Foreign Service and the relationship of required retirement to that goal.

As we have indicated, under the Rogers Act retirement of Foreign Service officers was required at 65, whereas under the relevant statute the retirement age for most Civil Service employees with sufficient length of service was 70 years of age. Choosing the lower age for the Foreign Service was a considered choice.[21] The principal sponsor of the legislation identified the reason for retiring Foreign Service and military officers earlier than Civil Service employees:

> "I think the analogy of the foreign service officer to the Army officer and to the naval officer is much more complete than to the civil-service employee in Washington.
>
> "The foreign-service officer is going hither and yon about the world, giving up fixed places of abode, often rendering difficult and hazardous service of prime importance to the United States.
>
> .    .    .    .    .
>
> "I call to the attention of the gentleman the fact that the kind of service which these men must render involves going to the Tropics; it involves very difficult and unsettling changes in the mode of life. The consensus of opinion was that the country was better off to retire them, as a general rule, at 65." 65 Cong. Rec. 7564–7565 (1924) (Rep. Rogers).

In the intervening years, the Federal Government has often repeated the concern first raised in 1924.[22] Congress not only

---

[21] Congress expressly rejected setting the Foreign Service retirement age at the same level as for Civil Service personnel. 65 Cong. Rec. 7586 (1924).

[22] E. g., S. Rep. No. 168, 77th Cong., 1st Sess., 2 (1941), and H. R. Rep. No. 389, 77th Cong., 1st Sess., 3 (1941) (reprinting letter from

retained the lower retirement age for Foreign Service officers when it reorganized the Foreign Service in 1946, but it also lowered the age to 60. In expanding the coverage of the Foreign Service retirement system to reach others than Foreign Service officers, Congress obviously reaffirmed its own judgment that the system should provide a lower retirement age than in the Civil Service system, just as it did in 1978 when it repealed the mandatory age for the retirement of Civil Service employees but left intact the rule for those under the Foreign Service system.[23]

The District Court did not deny the legitimacy of the

---

Secretary of State Hull) ("experience has shown that the continued strain of 30 years or more of service representing this Government in foreign countries in widely different climates and environments makes it desirable both from the standpoint of the Government and of officers that retirements should be authorized by law, commencing at a minimum of 50 years of age"); Fifth Report of the Committee on Retirement Policy for Federal Personnel, S. Doc. No. 89, 83d Cong., 2d Sess., pt. 5, pp. 280–281 (1954) (employees consider that "Foreign Service as compared with service in the United States has many disadvantages"); Appendix to the Report to the President by the Cabinet Committee on Federal Staff Retirement Systems, S. Doc. No. 14, 90th Cong., 1st Sess., 112 (1967) ("The mandatory retirement age of 60 is set in recognition of the need to maintain the Foreign Service as a corps of highly qualified individuals with the necessary physical stamina and intellectual vitality to perform effectively at any of some 300 posts throughout the world including those in isolated, primitive, or dangerous areas").

When Congress included career staff in the retirement system, it found that the same concern applies to them:

"The Foreign Service retirement system is designed to give recognition to the need for earlier retirement age for career Foreign Service personnel who spend the majority of their working years outside the United States adjusting to new working and living conditions every few years. Staff personnel who serve for any length of time are subject to the same conditions." H. R. Rep. No. 2104, 86th Cong., 2d Sess., 31 (1960).

[23] Of course, nothing in the Constitution, or in this opinion, limits Congress in reversing its judgment on this score or in determining that other competing policies are more important.

legislative purpose to assure a vigorous and competent Foreign Service, nor did it reject the proposition that the mandatory retirement provision could rationally be deemed to serve that end. It thus assumed that overseas duty is more demanding than stateside duty and that those over age 60 often are less able to face the rigors of the Foreign Service. The District Court nevertheless invalidated § 632 because it was deemed to discriminate against older Foreign Service employees vis-à-vis those older employees in the Civil Service who serve overseas in comparable positions for nearly as long as do Foreign Service personnel and yet are not forced to retire at age 60. Only a small percentage of all United States civilians working in foreign countries for this Government are within the scope of § 632, and, according to the District Court, it is "patently arbitrary and irrational" to impose the disadvantage of early retirement upon only those relatively few. 436 F. Supp., at 138.

Our first difficulty with this conclusion is that it ignores what we have already pointed out—namely, that Congress has legislated separately for the Foreign Service and has gone to great lengths to assure that those conducting our foreign relations will be sufficiently competent and reliable in all respects. If Congress attached special importance to high performance in these positions, which it seems to us that it did, it was quite rational to avoid the risks connected with having older employees in the Foreign Service but to tolerate those risks in the Civil Service. Whether or not individual judges may agree with this assessment, it is not for the courts to reject it.

Putting aside this rational basis for sustaining § 632, however, the District Court was in error for other reasons in invalidating the statute on the ground that Civil Service employees serving overseas under similar conditions and facing comparable hardships were not also subject to the burden of early retirement. Those subject to § 632 compose a rela-

tively small group of public servants furnishing the required professionalism in the Foreign Service. Approximately 60% of them are serving in overseas posts at any one time. Almost all of them are subject to assignment to such posts at any time as a condition of their employment.[24] Each such person is assigned and reassigned with some regularity and each spends a substantial portion of his career overseas. Even accepting the District Court's judgment that some Civil Service employees serve in foreign posts under conditions as trying as those faced by Foreign Service officers, the latter are trained for and experienced at performing tasks in the Foreign Service; they are not freely interchangeable with Civil Service employees. It would thus appear sensible that the Government would take steps to assure itself that not just some, but *all*, members of the Service have the capability of rendering superior performance and satisfying all of the conditions of the Service.

The same is not true of the Civil Service. Only approximately 5% of these employees serve overseas at any one time, and foreign duty is in the main a voluntary matter.[25] We

---

[24] Not only must these employees constantly be available for foreign duty, but also Foreign Service officers are required by law to spend most of their careers overseas. 22 U. S. C. § 961 (a). Most but not all of the employees subject to mandatory retirement at age 60 are subject to this latter requirement. The reason for the incomplete correlation is that not all those who are participants in the Foreign Service retirement system, 22 U. S. C. § 1063, are also defined as "officer[s] or employee[s] of the Service" by § 961 (a). See also 22 U. S. C. § 937 (assignment of staff officers and employees). When Congress first provided for the integration of certain Civil Service employees of the State Department into the Foreign Service, it did so specifically to increase "the number of officers available for assignment overseas . . . ." S. Rep. No. 127, *supra* n. 14, at 2.

[25] The District Court was able to state with assurance only that a relative handful of these Civil Service personnel—employees of the Foreign Agricultural Service—remain overseas for nearly as long as do Foreign Service officers. 436 F. Supp., at 137. Many of the overseas Civil Serv-

are unwilling to hold that if Congress deems early retirement a useful device to maintain the quality of the Foreign Service it may nevertheless not adopt it without insisting on the same retirement age for all Civil Service employees or at least for those Civil Service employees who choose to seek a career in overseas service. In order to staff the overseas Civil Service positions with sufficiently competent persons Congress obviously has not thought it useful to provide for retirement at age 60. At least to date, its judgment has been otherwise with respect to the Foreign Service, and that judgment is not invalid as a denial of equal protection.

Even if the classification involved here is to some extent both underinclusive and overinclusive, and hence the line drawn by Congress imperfect, it is nevertheless the rule that in a case like this "perfection is by no means required." *Phillips Chemical Co. v. Dumas School Dist.*, 361 U. S. 376, 385 (1960); accord, *San Antonio School Dist. v. Rodriguez*, 411 U. S. 1, 51 (1973). The provision "does not offend the Constitution simply because the classification 'is not made with mathematical nicety . . . .' " *Dandridge v. Williams*, 397 U. S. 471, 485 (1970), quoting *Lindsley v. Natural Carbonic Gas Co.*, 220 U. S. 61, 78 (1911).[26] If increasing age brings with it increasing susceptibility to physical difficulties, as the District Court was apparently willing to assume, the fact that individual Foreign Service employees may be able to perform past age 60 does not invalidate § 632 any more than did the similar truth undercut compulsory retirement at age 50 for uniformed state police in *Murgia*. Because Congress desired to maintain the competence of the Foreign Service, the mandatory retirement age of 60 rationally furthers

ice employees work for the military and have a statutorily guaranteed right of return to posts in the United States. 10 U. S. C. § 1586.

[26] "[T]he demand for perfection must inevitably compromise with the hard facts of political life." Tussman & tenBroek, The Equal Protection of the Laws, 37 Calif. L. Rev. 341, 350 (1949).

its legitimate objective, and it makes no difference that some Foreign Service personnel may not be subject to the rigors of overseas service or that some Civil Service employees serve in various hardship positions in foreign lands.

We accept such imperfection because it is in turn rationally related to the secondary objective of legislative convenience. The Foreign Service retirement system and the Civil Service retirement system are packages of benefits, requirements, and restrictions serving many different purposes. When Congress decided to include groups of employees within one system or the other, it made its judgments in light of those amalgamations of factors. Congress was entitled to conclude that certain groups of employees share more characteristics with Foreign Service officers than with Civil Service personnel even though not serving for as long in as important overseas posts, and that other employees share more characteristics with Civil Service personnel than with Foreign Service officers even though serving some time in some overseas positions. Congress chose not to examine exactly which individual employees are likely to serve long enough in important enough positions in demanding enough locales to warrant mandatory early retirement. Rather than abandoning its primary end completely, or unnecessarily including all federal employees within the means, it drew a line around those groups of employees it thought most generally pertinent to its objective. Whether we, or the District Court, think Congress was unwise in not choosing a means more precisely related to its primary purpose is irrelevant. *Califano* v. *Jobst,* 434 U. S. 47, 56–58 (1977); *New Orleans* v. *Dukes,* 427 U. S. 297, 303 (1976).

## IV

Despite all this, appellees urge us to affirm the judgment on a basis not relied upon by the District Court: that the mandatory retirement age of 60 has no relation to the objective of reliable service in important foreign posts because

overseas conditions often are not in fact more taxing than those in the United States and because arriving at 60 has an insufficient relationship to reduced physical and mental potential.[27]

Appellees rely in particular on the posture of the case—cross motions for summary judgment. They point out that their affidavits state that many overseas posts are as comfortable and safe as any in the United States; that many Foreign Service personnel under 60 have health problems; that employees just under the mandatory retirement age fill their fair share of hardship posts; and that age is not related to susceptibility to certain diseases and ailments commonly linked to life overseas.

Appellees seem to believe that appellants had to have current empirical proof that health and energy tend to decline somewhat by age 60 and had to offer such proof for the District Court's perusal before the statute could be sustained.[28] Such evidence of course would argue powerfully for sustaining the statute, see *Murgia*, 427 U. S., at 314–315, n. 7. But this case, as equal protection cases recurringly do, involves a legislative classification contained in a statute. In ordinary civil litigation, the question frequently is which party has

---

[27] This latter ground amounts to a contention that there is no justification for discriminating between Foreign Service employees over 60 and those under that age. Indeed, when pressed in oral argument, appellees stated that as an entirely separate theory. Tr. of Oral Arg. 27–29. But as noted earlier, n. 10, *supra*, the District Court found that appellees had abandoned any claim of this kind. Appellees have not informed us of any reason to believe that the District Court erred in that regard, and we are unable to discern one. In any event, as indicated in the text, we find no merit in the contention that Congress could not conclude that age involves increased risks of less than superior performance in overseas assignments. We note also that the argument is unresponsive to the justification for § 632 canvassed in Part II of this opinion.

[28] "The State is not compelled to verify logical assumptions with statistical evidence." *Hughes* v. *Alexandria Scrap Corp.*, 426 U. S. 794, 812 (1976).

shown that a disputed historical fact is more likely than not to be true. In an equal protection case of this type, however, those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker. *Lindsley* v. *Natural Carbonic Gas Co.*, 220 U. S., at 78–79; accord, *Schilb* v. *Kuebel*, 404 U. S. 357, 364 (1971); *United States* v. *Maryland Savings-Share Ins. Corp.*, 400 U. S. 4, 6 (1970); see *McGinnis* v. *Royster*, 410 U. S. 263, 274 (1973) (finding that the legislature "could have concluded rationally that" certain facts were true); *Williamson* v. *Lee Optical Co.*, 348 U. S. 483, 487 (1955). As we have said in a slightly different context:

> "The District Court's responsibility for making 'findings of fact' certainly does not authorize it to resolve conflicts in the evidence against the legislature's conclusion or even to reject the legislative judgment on the basis that without convincing statistics in the record to support it, the legislative viewpoint constitutes nothing more than what the District Court in this case said was 'pure speculation.'" *Firemen* v. *Chicago, R. I. & P. R. Co.*, 393 U. S., at 138–139.

Consequently, appellees were required to demonstrate that Congress has no reasonable basis for believing that conditions overseas generally are more demanding than conditions in the United States and that at age 60 or before many persons begin something of a decline in mental and physical reliability. Appellees have not satisfied these requirements. They say that many overseas posts are as pleasant as those in the United States and that many people over age 60 are healthy and many younger people are not.[29] But they admit that age

---

[29] Congress allows appellants to retain individual employees for up to five years beyond retirement age, if that is determined "to be in the public interest," 22 U. S. C. § 1002, thus eliminating some of the over-

does in fact take its toll, and that Congress could perhaps have rationally chosen age 70 as the cutoff. Brief for Appellees 76–77; see Tr. of Oral Arg. 21–24, 27. And we have noted the common-sense proposition that aging—almost by definition—inevitably wears us all down.[30] *Murgia, supra,* at 315. All appellees can say to this is that "[i]t can be reasonably argued that, given modern societal facts," those between age 60 and 70 are as reliable as those under age 60. Brief for Appellees 76. But it is the very admission that the facts are arguable that immunizes from constitutional attack the congressional judgment represented by this statute:

> "It makes no difference that the facts may be disputed or their effect opposed by argument and opinion of serious strength. It is not within the competency of the courts to arbitrate in such contrariety." *Rast* v. *Van Deman &* *Lewis Co.,* 240 U. S. 342, 357 (1916).

For these reasons, the judgment appealed from must be reversed.

*So ordered.*

Mr. Justice Marshall, dissenting.

The Court today finds a rational basis for the forced retirement of Foreign Service personnel at age 60, on a record devoid of evidence that persons of that age or older are less capable of performing their jobs than younger employees. I adhere to my view in *Massachusetts Bd. of Retirement* v. *Murgia,* 427 U. S. 307, 317–327 (1976) (Marshall, J., dissenting), that mandatory retirement provisions warrant more than this minimal level of equal protection review. Because

---

inclusiveness. It also has provided for mandatory early retirement due to medical disability, which mitigates underinclusiveness.

[30] The biennial physical examinations relied upon by the dissent, *post,* at 122, do not remove the risk of unexpected health problems undercutting reliability in the interim.

I believe that the statute at issue here cannot withstand closer scrutiny, I respectfully dissent.

## I

A person's interest in continued Government employment, although not "fundamental" as the law now stands, certainly ranks among the most important of his personal concerns that Government action would be likely to affect. *Id.*, at 322–323; cf. *Arnett* v. *Kennedy*, 416 U. S. 134 (1974); *Board of Regents* v. *Roth*, 408 U. S. 564, 572 (1972); *Smith* v. *Texas*, 233 U. S. 630, 636, 641 (1914). This interest is of special significance to older employees, because

> "[o]nce terminated, the elderly cannot readily find alternative employment. The lack of work is not only economically damaging, but emotionally and physically draining. Deprived of his status in the community and of the opportunity for meaningful activity, fearful of becoming dependent on others for his support, and lonely in his new-found isolation, the involuntarily retired person is susceptible to physical and emotional ailments as a direct consequence of his enforced idleness. Ample clinical evidence supports the conclusion that mandatory retirement poses a direct threat to the health and life expectancy of the retired person . . . ." *Massachusetts Bd. of Retirement* v. *Murgia, supra,* at 323 (footnote omitted).

When legislative action affects individual interests of such dimension, a heightened level of judicial scrutiny is appropriate.

In addition, mandatory retirement provisions warrant careful judicial attention because of the class on which the deprivation is imposed. To be sure, the elderly are not a "discrete and insular minorit[y]," *United States* v. *Carolene Products Co.*, 304 U. S. 144, 153 n. 4 (1938),[1] in need of

[1] The class is not "discrete and insular" because all of us may someday belong to it, and voters may be reluctant to impose deprivations that they

"extraordinary protection from the majoritarian political process." *San Antonio School Dist. v. Rodriguez*, 411 U. S. 1, 28 (1973). But they have suffered from discrimination based upon generalizations that are inaccurate for many, if not most, of the age group affected. See Report of the Secretary of Labor to the Congress on Age Discrimination in Employment Under Section 715 of the Civil Rights Act of 1964, The Older American Worker 8 (1965) (hereinafter Labor Report); 113 Cong. Rec. 34742 (1967) (remarks of Rep. Burke); H. R. Rep. No. 95–527, pt. 1, p. 2 (1977); Note, The Cost of Growing Old: Business Necessity and the Age Discrimination in Employment Act, 88 Yale L. J. 565, 576–577 (1979), and sources cited therein. Such generalizations stigmatize the aged as physically and mentally deficient, regardless of their individual capabilities. Cf. House Select Committee on Aging, Mandatory Retirement: The Social and Human Cost of Enforced Idleness, 95th Cong., 1st Sess., 35, 37 (Comm. Print 1977) (hereafter House Select Committee on Aging); C. Edelman & I. Siegler, Federal Age Discrimination in Employment Law 15–17 (1978) (hereafter Edelman & Siegler). Particularly in the area of employment, significant deprivations have been imposed on the basis of these stereotypes, see 29 U. S. C. § 621 (a); Labor Report 18–19; Note, The Age Discrimination in Employment Act of 1967, 90 Harv. L. Rev. 380, 380–381, 383 (1976).[2]

---

themselves could eventually have to bear. However, the time lag between when the deprivations are imposed and when their effects are felt may diminish the efficacy of this political safeguard. See L. Tribe, American Constitutional Law 1077 n. 3 (1978). The safeguard is also inadequate where, as here, the deprivation affects only a small and distinct segment of the work force, of which few legislators or voters will ever be a part. Thus, the elderly should receive an extra measure of judicial protection from majoritarian political processes in circumstances such as those presented here.

[2] In its statement of findings and purpose for the Age Discrimination in

Considering the importance of the interests at stake and the prevalence of discrimination against the aged, I cannot agree that the glancing oversight of the rational-basis test fulfills our obligation to ensure that all persons receive the equal protection of the laws. I would require proof that the Foreign Service's mandatory retirement scheme "serves important governmental objectives and [is] substantially related to achievement of those objectives." *Califano* v. *Webster,* 430 U. S. 313, 316–317 (1977); *Craig* v. *Boren,* 429 U. S. 190, 197 (1976); *Massachusetts Bd. of Retirement* v. *Murgia,* 427 U. S., at 325 (MARSHALL, J., dissenting). Measured by this standard, the Foreign Service's mandatory retirement provisions must fall.

## II

Before applying this intermediate standard, it is first necessary to determine the nature of the classifications that the statute delimits. In this case, there are two. The statutory scheme distinguishes between civil servants and Foreign Service personnel and between Foreign Service employees under 60 and those 60 or over. Appellees unequivocally claimed in this Court that the latter distinction was unconstitutional, see Brief for Appellees 76–78; Tr. of Oral Arg. 26–28, as the Court seems to concede, *ante,* at 109–110, and n. 27. Nonetheless the Court summarily dismisses this claim, finding that ap-

Employment Act of 1967, 81 Stat. 602, 29 U. S. C. § 621 (a), Congress noted that:

"(1) in the face of rising productivity and affluence, older workers find themselves disadvantaged in their efforts to retain employment, and especially to regain employment when displaced from jobs;

"(2) the setting of arbitrary age limits regardless of potential for job performance has become a common practice, and certain otherwise desirable practices may work to the disadvantage of older persons;

"(3) the incidence of unemployment, especially long-term unemployment with resultant deterioration of skill, morale, and employer acceptability is, relative to the younger ages, high among older workers; their numbers are great and growing; and their employment problems grave . . . ."

pellees abandoned it below after the judgment of the District Court had issued.

By limiting its consideration of the classifications at issue, the majority has evaded the more difficult question in this case. This Court has repeatedly held that a "prevailing party may . . . assert in a reviewing court any ground in support of his judgment, whether or not that ground was relied upon or even considered by the trial court." *Dandridge* v. *Williams,* 397 U. S. 471, 475 n. 6 (1970); accord, *California Bankers Assn.* v. *Shultz,* 416 U. S. 21, 71 (1974); *Langnes* v. *Green,* 282 U. S. 531, 538–539 (1931); *United States* v. *American Railway Express Co.,* 265 U. S. 425, 435 (1924).[3] The judgment of the District Court was that § 632 of the Foreign Service Act of 1946, 22 U. S. C. § 1002, "violates the equal protection guarantees embodied in the Fifth Amendment." App. to Juris. Statement 9A. Appellees' contention that the statute discriminates against persons aged 60 and over patently is a ground for affirming that judgment. Whether appellees previously abandoned the issue is irrelevant since the purported abandonment came after the District Court had granted summary judgment. Because the Government had the opportunity to present evidence on the issue, it could in no way be prejudiced by its resurrection here. Thus, the claim is properly before us.

## III

Undoubtedly, an important objective of the Foreign Service retirement system is to assure the "professional competence"

---

[3] This rule does not apply where accepting the ground advanced for affirmance would result in greater relief than was granted below. See *FEA* v. *Algonquin SNG, Inc.,* 426 U. S. 548, 560 n. 11 (1976); *United States* v. *Raines,* 362 U. S. 17, 27 n. 7 (1960). The Court quite correctly does not rely on such a possibility here, as appellees claim only that their evidence establishes the impermissibility of mandatory retirement before age 70, and seek no greater relief than was granted below. Brief for Appellees 76; Tr. of Oral Arg. 23–24.

of the Foreign Service corps. See *ante,* at 97. The Court finds that mandatory retirement at age 60 is rationally related to this objective in two ways. In the Court's view, the physical and psychological difficulties that Foreign Service personnel face as a result of frequent overseas assignments impair their performance at an earlier age than most persons including, it seems, civil servants exposed to much the same conditions. Hence, the majority concludes, Congress could reasonably have determined that 60-year-olds would lack the vitality necessary to perform their jobs competently. The Court also finds that the early retirement age creates "room at the top," thereby ensuring a predictable supply of promotion opportunities for younger employees. Such opportunities, it is said, are necessary to "spur morale and stimulate superior performance in the ranks." *Ante,* at 98. A fair reading of the record before us, however, reveals no substantial relationship between the mandatory retirement system and the articulated objective of the statutory scheme.

## A

In my judgment, appellees have successfully challenged the Government's central premise that the pressures of transient Foreign Service life diminish the capacity of older employees to perform their jobs. There is nothing inherent in any of the positions that appellees hold to indicate that early retirement is necessary to ensure excellence. Foreign Service officers in the State Department engage in economic and political research, visa or other consular work, negotiations with representatives of foreign governments, personnel recruitment and management, and other administrative functions. See United States Dept. of State and International Communication Agency, Foreign Service Officer Careers 4–8 (1978). Officers in the International Communication Agency lecture and perform cultural and other informational duties, as well as administrative and personnel management functions. *Id.,*

118

at 8–10. The Agency for International Development (AID) employs economists, financial analysts, staff attorneys, auditors, and accountants in providing economic and technical assistance to other countries. U. S. Civil Service Comm'n, Federal Jobs Overseas 10–11 (1975). The mandatory retirement provisions in addition cover Foreign Service staff personnel who perform technical, administrative, clerical, or custodial work. See H. R. Rep. No. 2104, 86th Cong., 2d Sess., 15 (1960).[4]

That older workers could effectively perform such Foreign Service jobs is also suggested by the lack of an early mandatory retirement provision for civil servants who spend much of their careers abroad doing work similar to that of Foreign Service personnel. Of the over 58,000 American civilians in Government positions overseas in 1976, only the 4,787 Foreign Service personnel faced mandatory retirement at age 60. 436 F. Supp. 134, 136 (DC 1977). Moreover, discrete segments of this work force, such as the Agriculture Department's Foreign Service, spend almost as much of their tenure overseas as do members of the State Department's Foreign Service. *Id.,* at 137. The Court discounts these figures because it finds that the need for excellence in the Foreign Service may be more compelling than in the Civil Service. *Ante,* at 106. However, almost 40% of the Americans working overseas for Foreign Service agencies are civil servants who are not subject to forced retirement, and AID often has its work performed on a contract basis by other agencies that do not have mandatory retirement provisions. 436 F. Supp., at 136–137; see § 5, 92 Stat. 191. Despite this broad experience with older workers in

---

[4] The jobs at issue in this case certainly involve nothing equivalent to the "stress functions" performed by the police officers in *Massachusetts Bd. of Retirement* v. *Murgia,* 427 U. S. 307, 311 (1976). The officers there were required, *inter alia,* to control prison and civil disorders, respond to emergencies and natural disasters, and apprehend criminal suspects. *Id.,* at 310.

analogous situations, the Government submitted no evidence that it has encountered age-related problems in connection with these or other civil servants aged 60 and over.

Appellees, on the other hand, introduced a substantial amount of medical testimony dispelling any adverse correlation between job performance and advancing age, and offered to introduce more. For example, the former chief psychiatrist for the Peace Corps stated flatly that "inability to perform work satisfactorily under stressful conditions in overseas cultures has no relationship to advancing age." Affidavit of Dr. J. English 2. See also Affidavit of Dr. D. Kessler; Affidavit of T. Fox.[5] Similarly, appellees have pointed to a variety of studies indicating that older workers may be *more* competent than younger ones in the types of jobs involved in this case. The House Report accompanying the recent amendments to the Age Discrimination in Employment Act, H. R. Rep. No. 95-527, pt. 1, p. 4 (1977), noted:

> "Testimony to the committee cited the results of various research findings which indicate that older workers were as good or better than their younger coworkers with regard to dependability, judgment, work quality, work volume, human relations, and absenteeism; and older workers were shown to have fewer accidents on the job. As Congressman Pepper stated before our committee: 'The Labor Department's finding that there is more variation in work ability within the same age group than between age groups justifies judging workers on competency, not age.' " (Footnote omitted.)

---

[5] In addition, a pulmonary specialist testified for appellees:

"While some loss of pulmonary function occurs with age, such loss does not ordinarily advance to the pathological stage where it interferes with the ability to work and otherwise function. Certainly, such normal loss would not impair the ability of an individual to work effectively between the ages of sixty and seventy." Affidavit of Dr. A. Munzer 2.

120

The House Select Committee on Aging 34 also observed:

"Studies by the Department of Labor, the late Ross McFarland of the Harvard School of Public Health, the National Council on the Aging, and many other experts in the field indicate that older workers can produce a quality and quantity of work equal or superior to younger workers, that they have as good, and usually better, attendance records as younger workers, that they are as capable of learning new skills and adapting to changing circumstances when properly presented as younger workers, and that they are generally more satisfied with their jobs than younger workers."

See also Report of the Secretary of Labor to the Congress Under Section 715 of the Civil Rights Act of 1964: Research Materials 86 (1965); Edelman & Siegler 27–31; Note, 88 Yale L. J., at 576–577, and sources cited therein.

The Court closes its eyes to appellees' evidence against the mandatory retirement provision and excuses the Government from producing evidence in support of it because Congress determined that the nomadic life of Foreign Service personnel would take its toll by the age of 60. This determination, the Court concludes, rested on the "common-sense proposition that aging—almost by definition—inevitably wears us all down." *Ante*, at 112.[6] The issue, however, is not whether persons

―――――――

[6] It may in fact be overstatement to refer to a "[c]ongressional determination" on this issue. The only express evidence that Congress predicated early mandatory retirement on this theory came, during the 1924 debates on the Foreign Service Act, when one Congressman noted the hardships of the transient life and of service in the Tropics. 65 Cong. Rec. 7565. The focus of the debate, however, was on the need for better salaries and retirement provisions in order to attract qualified persons into the Service. And since modes of travel as well as conditions in the Tropics and elsewhere overseas obviously have changed considerably since 1924, reliance on this legislative justification is misplaced. Cf. *United States v. Carolene Products Co.*, 304 U. S. 144, 153 (1938).

When Congress extended the Foreign Service retirement system to staff

between age 60 and 70 "wear down," but whether they are competent Foreign Service personnel. Absent any concrete evidence in the record that they are less able, or indeed, any indication that Congress even considered such information when it enacted the statute, see n. 6, *supra,* the Court is remitted to unsubstantiated assumptions concerning the competency of older workers for white-collar jobs.

With respect to sex discrimination, we have refused to accept " 'overbroad' generalizations" about the characteristics of a particular class as substantial support for a legislative classification. See *Califano* v. *Goldfarb,* 430 U. S. 199, 211 (1977) (plurality opinion); *Craig* v. *Boren,* 429 U. S., at 198–199; *Stanton* v. *Stanton,* 421 U. S. 7 (1975); *Frontiero* v. *Richardson,* 411 U. S. 677 (1973). I believe the same rule should apply here. See *supra,* at 113–115. While age, unlike sex, is at some point likely to bear a relationship to ability, I would require a showing that a substantial relationship does in fact exist. Thus, to the extent that Congress in § 632 viewed age as predictive of a decline in competence, this Court should not simply assume the correlation, but should inquire whether age is a sufficiently accurate predictor to justify the significant deprivations imposed by forced retirement. See *Craig* v. *Boren, supra,* at 201–202.[7] Since ap-

---

personnel, it cited the frequent adjustments that the jobs required. However, it did so in the context of recommending that staff personnel be able to enjoy the "advantages" of the retirement system, H. R. Rep. No. 2104, 86th Cong., 2d Sess., 31 (1960), that is, that they be *permitted* to retire at an early age if they so desired. Thus, the 1960 legislative history nowhere reflects an assessment of the competence of these personnel to perform their jobs.

Given the staleness of the only express congressional "determination" before us, and Congress' failure subsequently to focus on the issue, one may question the appropriateness of the extraordinary deference the Court here affords to congressional factfinding. See *ante,* at 109–112.

[7] The Court implies that there is a "close fit" here because it appears "sensible that the Government would take steps to assure itself that not just some, but *all,* members of the Service have the capability of rendering

pellees have adduced considerable evidence demonstrating the absence of any correlation, and the Government has presented no evidence to the contrary, the record simply does not support the Court's result.

Not only is mandatory retirement an insufficiently accurate predictor of competence, it is also an unnecessary one. As the Foreign Service personnel system now operates, persons who do not measure up to Service standards are selected out, or terminated, after an annual review. *Ante,* at 99. Further, all Foreign Service employees are given biennial medical examinations, as well as special examinations when necessary, and are subject to medical selection out if they are not fit for duty. See Record 20. Under this scheme, then, the continued competence of appellants' personnel is periodically assessed. With such individualized procedures already in effect, the Government cannot realistically claim that prohibiting resort to age-based generalizations would jeopardize the quality of the Foreign Service. Cf. *United States Dept. of Agriculture* v. *Murry,* 413 U. S. 508, 518–519 (1973) (MARSHALL, J., concurring); *Craig* v. *Boren, supra,* at 199.

### B

The other ground on which the Court upholds mandatory retirement is its function of

> "stimulating the highest performance in the ranks of the Foreign Service by assuring that opportunities for promotion would be available despite limits on the number of personnel classes and on the number of positions in the

superior performance and satisfying all of the conditions of the Service." *Ante,* at 107. Significantly, however, the majority adverts to no evidence suggesting that Congress intended mandatory retirement to serve that objective. In any event, as the Court concedes, *ante,* at 108, the statute is both overinclusive and underinclusive with respect to this goal. And, as demonstrated *infra,* this page, the Government has available other more precise means to assure professional competence and physical ability.

Service. Aiming at superior achievement can hardly be characterized as illegitimate, and it is equally untenable to suggest that providing promotion opportunities through the selection-out process and through early retirement does not play an acceptable role in the process." *Ante,* at 101.

This justification, it seems to me, would legitimate *any* retirement system in which there are a limited number of high-level positions. Indeed, the Court acknowledges as much when it deems the rationale equally applicable to Foreign Service staff personnel, who were not designated by Congress as an elite cadre but who are nonetheless subject to the mandatory retirement provisions. *Ante,* at 99–100, n. 15. The fundamental flaw in this analysis is that the Court ends rather than begins its inquiry by articulating the legislative goal of a competent Foreign Service. See *Trimble* v. *Gordon,* 430 U. S. 762, 769 (1977). The question that the majority fails to pursue is whether, on balance, mandatory retirement at 60 substantially furthers this goal.

The answer is not readily apparent, for even if mandatory retirement does ensure promotional opportunities for younger employees, it also deprives the Service of the talents of persons who it has admitted are, at least at the time of their retirement, "its best officers." S. Doc. No. 14, 90th Cong., 1st Sess., 118 (1967). In the absence of any evidence that employees aged 60 and over are less able, or that forced retirement does in fact boost productivity by enhancing recruitment and promotional opportunities, this proffered justification does not withstand analysis.

Moreover, appellees note that most Foreign Service officers, prompted by the generous pension benefits offered by the Service, retire well before the age of 60. See Record 20. The experience of the Civil Service and private employers suggests that this pattern would not change significantly were the mandatory retirement age raised. See U. S. Civil Service

Comm'n, Federal Fringe Benefit Facts 16–17, 22 (1977); Retirement Age Policies: Hearing before the House Select Committee on Aging, 95th Cong., 1st Sess., pt. 1, p. 30 (1977).[8] Thus, it cannot be assumed that, absent § 632, many Foreign Service personnel would stay on to "clog the promotional stream" for younger persons, particularly since those who remain would still be subject to selection out for health reasons, poor performance, or nonpromotion.

## IV

I do not disagree, of course, that Congress could legitimately take "great pains to assure the high quality of those occupying positions critical to the conduct of our foreign relations in the post-war world." *Ante,* at 101. Nor do I contend that this Court should substitute *its* judgment for that of the Congress or the Foreign Service on the appropriate retirement system for Foreign Service personnel. I submit, however, that it is the function of this Court to assess constitutional challenges to that system on the record before us. Appellees presented substantial evidence that the mandatory retirement provision has not accomplished the purposes for which it was designed. The Government failed to establish otherwise. Where individuals' livelihood, self-esteem, and dignity are so critically affected, I do not believe the Government should be relieved of that responsibility.

Accordingly, I dissent.

---

[8] In fact, the Chairman of the Civil Service Commission testified recently:

"Insofar as the general Federal work force is concerned, the removal of the mandatory age 70 provision should have little effect on recruiting younger people. Our experience in recent years has been one of high turnover at the senior levels due to early retirement." H. R. Rep. No. 95–527, pt. 1, p. 3 (1977).