David R. MARTIN, Plaintiff-Appellant,

v.

Carl M. TAMAKI, General Manager of the Department of Water and Power for the City of Los Angeles, Robert V. Phillips, General Manager of the Department of Water and Power for the City of Los Angeles, Burton Gindler, Herbert Ward, Michael Glazer, George Kennedy, Patricia Nagle, William T. King, Jack L. Maloney, and Does I to V, Members of the Board of Department of Water and Power Commissioners of the Department of Water and Power of the City of Los Angeles, Defendants-Appellees.

No. 76–3744.

United States Court of Appeals, Ninth Circuit.

Oct. 29, 1979.

**308**

Clifford B. Scherer, Scherer & Lazarus, Encino, Cal., for plaintiff-appellant.

Burt Pines and David J. Oliphant, Water & Power, Los Angeles, Cal., for defendants-appellees.

Before CHAMBERS and TANG, Circuit Judges, and TURRENTINE,* District Judge.

TANG, Circuit Judge:

At age 65, David Martin was retired as an employee of the Los Angeles Department of Water and Power ("DWP"). He filed an action under 42 U.S.C. § 1983 charging that the city ordinance that authorized his mandatory retirement denied him his right to equal protection and, in allowing the DWP general manager to retain certain employees past the retirement age, constituted an unlawful delegation of authority. The district court granted the defendants' motion for summary judgment. Martin appealed. We now affirm.

The DWP is a municipally-owned public utility that provides the City of Los Angeles and several other communities with water and electricity. The DWP is treated as a separate entity under the city charter, and operates independently under the management of a Board of Commissioners. As a result, the DWP provides its employees with terms and conditions of employment that are generally different from those departments that are under the direct control of the City Council. Additionally, the city charter provides for four different retirement systems, one of which is the Water and Power Employees Retirement Plan.

Since 1965, Martin was employed by the DWP as a public relations representative. On June 16, 1974, Martin turned 65 years old and, pursuant to Los Angeles City Charter § 220.1(1)(c), was retired by the DWP on July 1, 1974.

Section 220.1(1)(c) is contained in Article XXII of the Charter. Article XXII deals only with the DWP, and consequently, the section governs only employees of the DWP. At the time of Martin's forced retirement, § 220.1(1)(c) provided that:

> said Department shall not employ nor retain in its employment any person subsequent to the first day of the calendar month which next follows such person's sixty-fifth birthday anniversary except for special reasons, and unless recommended by the General Manager of said Department and approved by the Board of Water and Power Commissioners . .

In contrast, § 508A of the city charter, which deals with the City Employees Retirement System, provides that every member of the City Employees Retirement System "shall be retired on the first day of the calendar month next succeeding that month in which he shall have reached the age of seventy (70) years." [1]

**I**

Although Martin only argues that DWP's retirement policy under § 220.1(1)(c) generally denied him equal protection, Martin is actually challenging two separate classifications created by § 220.1(1)(c). First, Martin urges that § 220.1(1)(c) violates equal protection because it creates distinctions between DWP employees of the age 65 and older and DWP employees younger than 65. Second, he contends that it creates distinc-

---

* Honorable Howard B. Turrentine, United States District Judge for the Southern District of California, sitting by designation.

1. Subsequent to the district court's decision, the Charter was amended to eliminate manda-

tory retirement for all city personnel, including DWP personnel. The amendment did not affect those, like Martin, who were already retired.

tions between DWP employees between the ages of 65 and 70 who are forced to retire under § 220.1(1)(c) and other city employees who are the same age but allowed to work until age 70 under § 508A. Neither classification, however, violates equal protection.

Crucial to equal protection analysis is the identification of the proper test under which the legislative classification should be scrutinized. Martin argues that the proper test should be one that is "more demanding" than that used to scrutinize economic legislation because of Martin's substantial interest in his government employment.

Any doubts, however, as to the proper test to be applied was settled by the Supreme Court in *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976), and more recently, in *Vance v. Bradley*, 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979). In *Murgia*, the plaintiff challenged a statute requiring that uniformed state police officers retire at age 50. The Court rejected the proposition that a right of governmental employment *per se* is fundamental, thus requiring a strict standard of review. *Murgia*, 427 U.S. at 312–13, 96 S.Ct. 2562. Instead, the Court held that the state's classification should be examined under the "rational relationship" standard.[2]

> This inquiry employs a relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one. Perfection in making the necessary classifications is neither possible nor necessary. . . . Such action by a legislature is presumed to be valid.

*Id.* at 314, 96 S.Ct. at 2567 (citations omitted). The Court then found the Massachusetts statute rationally related to the state's interest in assuring the physical preparedness of its uniformed police. *Id.*

In *Bradley*, the Court upheld the forced retirement at age 60 of participants in the Foreign Service Retirement System. In doing so, it reiterated the appropriate test:

> [W]e will not overturn such a statute unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational.

*Bradley*, 99 S.Ct. at 943.

Under this test, the city's decisions to retire employees at age 65 and older is permissible. There can be little doubt that, in most cases, the federal government or a state government may constitutionally set an age for the mandatory retirement of its employees. *See, e. g., Vance v. Bradley*, 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979); *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976); *Trafelet v. Thompson*, 594 F.2d 623 (7th Cir. 1979) (mandatory retirement for state judges at age 70 constitutional); *Palmer v. Ticcione*, 576 F.2d 459 (2nd Cir. 1978), *cert. denied*, 440 U.S. 945, 99 S.Ct. 1421, 59 L.Ed.2d 633 (1979) (mandatory retirement for teachers at age 70 constitutional); *Johnson v. Lefkowitz*, 566 F.2d 866 (2nd Cir. 1977) (mandatory retirement for civil service employees at age 70 constitutional); *Talbot v. Pyke*, 533 F.2d 331 (6th Cir. 1976) (mandatory retirement for park district employee at age 70 constitutional). *But see Gault v. Garrison*, 569 F.2d 993 (7th Cir. 1977), *cert. denied*, 440 U.S. 945, 99 S.Ct. 1421, 59 L.Ed.2d 633 (1979) (mandatory retirement of teachers at age 65 unconstitutional).[3] The city could have rationally concluded that § 220.1(1)(c) was related to

---

**2.** *See, e. g., Dandridge v. Williams*, 397 U.S. 471, 484–87, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); *McGowan v. Maryland*, 366 U.S. 420, 425–26, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961).

**3.** The court in *Gault* distinguished *Murgia* on the grounds that *Murgia* involved the deterioration of physical, not mental, skills, and that the imminent failure to perform by a policeman could become a matter of life and death. *Gault*, 569 F.2d at 996. *Gault*'s rationale is thus seriously undermined by the Supreme Court's decision in *Bradley* to allow compulsory retirement for members of the foreign service. Interestingly, the Seventh Circuit's opinion in *Trafelet v. Thompson*, 594 F.2d 623 (7th Cir. 1979) made no reference to *Gault*.

its interests in efficiency and economy.[4] A mandatory retirement policy allows a department to emphasize training and advancement of its employees and to motivate young workers to succeed and progress through the ranks. *See Johnson*, 566 F.2d at 869. The city may also have thought such a policy was necessary to open up more places for new people with fresh ideas. The compulsory retirement system for DWP employees is rationally related to any of these legitimate objectives.

Martin focuses primarily on the second identifiable classification. He argues that it is impermissible for the city to require that DWP employees retire at age 65 while it allows other city employees to remain until age 70. The city disputes whether this is really an equal protection question. Apparently, all city employees, including DWP employees, are hired through a Personnel Department which sets up job classifications and the duties and responsibilities associated with a particular job. However, the DWP differs from other city departments in significant respects. The DWP operates, through its own governing body, independently of other departments. It establishes the terms and conditions of employment for its employees, and as a result, DWP employees have different salary schedules and fringe benefits, including their own retirement, disability, and death benefit plans. Because of these distinctions, it is possible to view the DWP and other city departments as autonomous and independent entities, thereby providing no basis for an equal protection analysis.

■■ For the sake of argument, however, assuming that an equal protection question exists, we do not find the decision to retire DWP employees five years before other city employees to be violative of equal protection. The city has a particular interest in assuring that its citizens are supplied water and power. It may have concluded that emergency situations would arise which would make necessary a department with younger personnel. The city could have thought that the increasing likelihood of physical and mental deterioration for personnel between 65 and 70 years old was significant enough that there would be some incremental risk of harm if these employees' services were required during an emergency. A governmental body may set different ages of compulsory retirement among classes of its employees where it rationally perceives that the different work performed by the classes requires different treatment. *See Vance v. Bradley*, 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979). The decision that the DWP needs its own retirement system is a policy judgment best left to elected representatives. *See Bradley*, 99 S.Ct. at 946.

## II

■ Section 220.1(1)(c) allows a DWP employee to continue working past the age of 65 for "special reason," when recommended by the General Manager of the DWP and approved by the DWP Board. Martin contends that § 220.1(1)(c) is an unconstitutional delegation of power because it leaves unfettered discretion to the General Manager to retain an employee beyond the age of 65 years old.[5] This contention has no merit. *See Johnson v. Lefkowitz*, 556 F.2d 866, 869 n.3 (1977). The Gen-

---

**4.** There was little evidence of the city's purpose behind § 220.1(1)(c) presented before the district court. Under traditional equal protection analysis grounded on the rational relationship standard, evidence of governmental purpose was unnecessary because "a statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." *McGowan v. Maryland*, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961). Arguably, the Supreme Court's consideration of testimonial evidence concerning the state's purpose in *Murgia* suggests a different approach.

*See Murgia*, 427 U.S. at 311, 96 S.Ct. 2562. In *Bradley*, however, the Court rejected the necessity of such an approach. Although empirical proof would argue powerfully for sustaining the statute, an equal protection case of this type requires only a consideration of the rationality of the facts that the legislators could have conceived to be true. *Bradley*, 440 U.S. at 110, 99 S.Ct. at 950. *See Trafelet v. Thompson*, 594 F.2d 623, 626 (7th Cir. 1979).

**5.** The General Manager refused to recommend that Martin be retained.

eral Manager can only exercise discretion to retain an employee where there is a special reason to do so. Furthermore, the General Manager's decision is subject to approval by the DWP Board of Commissioners. Finally, Martin makes no showing that the General Manager abused this discretion with respect to Martin or any other employee.

### III

This opinion is not intended to endorse compulsory retirement as a matter of social policy. Like the Second Circuit,

> we are aware of the many older Americans who continue to be able and eager to work beyond age seventy. We are also aware of the debilitating effects that compulsory retirement has on many such individuals, with regard to their economic situation, their health, their outlook on life, and the continuing opportunities for fulfillment. However, in determining the desirability of compulsory retirement, these considerations must be weighed against the social goals that compulsory retirement furthers. This is precisely the type of clash of competing social goals that is best resolved by the legislative process. The federal courts should not second guess the wisdom or propriety of such legislative resolutions as long as they are rationally based.

*Palmer*, 576 F.2d at 464–65 (citation omitted).

Because we find that the city's resolution of these competing interests was rational, the judgment of the district court is affirmed.

Affirmed.