**In the Matter of the Contested Case of REM, INC., d.b.a. REM-Beltrami, Inc., REM-Bemidji, Inc., REM-Bloomington, Inc., REM-Canby, Inc., REM-Fairmont, Inc., REM-Lyndale, Inc., Mankato, Inc., REM-Marshall, Inc., REM-Montevideo, Inc., REM-Pillsbury, Inc., REM-Pleasant, Inc., REM-Redwood Falls, Inc., REM-Rochester, Inc., REM-Roseau, Inc., REM-St. Cloud, Inc., REM-Southeast, Inc., REM-Tyler, Inc., REM-Waite Park, Inc., Relators,**

v.

**DEPARTMENT OF HUMAN SERVICES, Respondent.**

No. CO–85–1703

Court of Appeals of Minnesota.

Feb. 25, 1986.

---

Gerald S. Duffy, Charles C. Jensch, Jeffrey G. Stephenson, St. Paul, for relators.

Hubert H. Humphrey, III, Atty. Gen., John L. Kirwin, Sp. Asst. Atty. Gen. St. Paul, for respondent.

Heard, considered and decided by FORSBERG, P.J., and LANSING and RANDALL, J.

## OPINION

FORSBERG, Judge.

Relators, providers of intermediate care facilities for mentally retarded persons, appeal the Commissioner of Human Services' determination that they are not entitled to receive a 93 percent occupancy incentive and that their 1981 and 1982 per diem rates are correct. They contend that the Commissioner's decision was arbitrary, not supported by substantial evidence, made in violation of constitutional provisions and based upon an error of law. We affirm.

## FACTS

REM-Bloomington and REM-St. Cloud (the facilities) are intermediate care facilities for mentally retarded persons. Both opened in 1981. Each had 15 licensed beds on December 31, 1981. Both are participating providers in Minnesota's medical assistance program.

The facilities' per diem welfare rates for 1981 and 1982 are governed by 12 MCAR § 2.052 (Rule 52) (1981).[1] Under this rule welfare rates for established facilities are

---

1. Later codified as Minn.R. Part 9510.0500–9510.0890. Effective January 1, 1984, Rule 52 was replaced by temporary Rule 53. 8 State Register 1860.

redetermined annually and are generally calculated on the basis of the facilities' historical costs, as adjusted. Until January 1, 1981, the per diem rate for each facility was calculated by dividing historical costs plus known cost changes by "actual resident days" for the previous year. On January 1, 1981, Rule 52 was amended to provide an incentive to facilities which maintained an occupancy rate above 93 percent. Under the amended provision fixed costs are divided by 93 percent of the facility's total capacity resident days rather than by actual resident days. Thus a facility which maintains an occupancy rate above 93 percent receives a bonus in its rate and a facility with an occupancy rate below 93 percent is penalized. Rule 52 B.1.a. Special procedures are used for establishing per diem rates for new facilities during their first two fiscal periods.

At the end of 1981 each facility filed a cost report for the fiscal period ending December 31, 1981. These reports govern the calculation of per diem welfare rates for the two facilities for 1981 and 1982. Each had an occupancy rate of more than 93 percent but calculated per diem rates using the 93 percent incentive rule. Since each facility had an actual occupancy higher than the 90 percent during the start-up period, the incentive increased the per diem rate. The Department of Human Services (DHS) refused to apply the incentive for either the start-up period or the next fiscal year, 1982. Based on REM-Bloomington's initial cost report, it set the per diem rate effective April 13, 1981, at $66.58 per day and the per diem rate effective January 1, 1982, at $71.49 per day. Based on REM-St. Cloud's initial cost report, DHS set the per diem rate effective April 1, 1981, at $63.71 per day and the per diem rate effective January 1, 1982, at $69 per day. DHS based its calculations upon the actual resident days. If DHS had applied the 93 percent occupancy provision, Bloomington's per diem rate for 1981 would have been $68.24 and its rate for 1982 would have been $74.24; St. Cloud's rate for 1981 would have been $65.78 and the rate for 1982 would have been $71.75.

Both facilities appealed from the final rate payment notices. After a contested case the administrative law judge found that the rules are clear and unambiguous. He concluded that the per diem rate for new facilities during their first two years is governed by Rule 52 B.3.a(3) and the Department properly disallowed the occupancy incentive contained in Rule 52 B.1.a. The Commissioner adopted both the administrative law judge's findings and conclusions and ordered that the Department's rate determination be affirmed.

## ISSUE

Does the 93 percent occupancy incentive apply to new facilities which have an occupancy rate above 93 percent?

## ANALYSIS

Rule 52 B.1.a provides the method for calculating per diem rates based on historical costs. It contains the 93 percent occupancy incentive. The last sentence of this section provides:

> This provision shall not be in conflict with section B.3.a(3).

12 MCAR § 2.052 B.1.a.

Rule 52 B.3.a(3) provides the method for calculating per diem welfare rates for new facilities which would have no historical cost experience. Under this section a new facility can request an interim welfare rate based upon projected costs. The rate is subject to retroactive upward or downward adjustment based on the facility's actual costs reported in the initial cost report. Adjustments to the interim rate may be made at the end of the first fiscal year or after no less than six months of experience. This rate is called a settlement rate:

> The settlement must be based on at least six months of historical costs and statistical experience.

12 MCAR § 52 B.3.a(3). A new facility's initial cost report is also used to compute the per diem rate for the first fiscal year following the start-up period. Costs are divided by actual occupancy:

Occupancy for the immediate fiscal year *must* be based on an annualization of the last three months of the interim fiscal year, but not less than 90 percent occupancy.

*Id.* (emphasis added).

■ Section B.3.a(3) requires the settlement rate be based on statistical experience. Statistical experience includes actual occupancy figures. Likewise it requires that the rate for the following year be based on an annualization of the occupancy for the last three months of the interim fiscal year. Again the occupancy is actual occupancy. These provisions conflict with the 93 percent occupancy incentive in section B.1.a because the rates are measured by actual occupancy. Since there is a conflict between the sections, section B.3.a(3) governs.

■ The facilities argue that the language of section B.1.a is ambiguous and must be construed. We find no ambiguity. Therefore, we need not resort to the canons of construction or other aids. *See Minneapolis-St. Paul Sanitary District v. City of St. Paul,* 240 Minn. 434, 437, 61 N.W.2d 533, 535–36 (1953). Indeed we are precluded from doing so for while extrinsic aids may be used to resolve ambiguities which exist, they cannot be used to create them. *Id.* Thus, we will not consider the facilities' contention that substantial evidence does not support the DHS's interpretation of section B.1.a.

■ The administrative law judge noted that the "parties agreed that Rule 52 B.1.a does not apply to new facilities whose occupancy is less than 93 percent during the start-up period." The facilities do not take issue with this statement. If the effect of the provision that section B.1.a. shall not be in conflict with section B.3.a(3) is to exempt new facilities with less than 93 percent occupancy from the provisions of section B.1.a, then it must exempt new facilities with more than 93 percent occupancy. The provision declaring that there shall be no conflict makes no distinction between facilities which have an occupancy rate above 93 percent and those which have an occupancy rate below 93 percent.

■ The facilities claim they have been denied equal protection because new and existing facilities are similarly situated. An economic or social welfare classification will not be set aside under the equal protection clause unless it is shown to have no rational or reasonable basis. *Highland Chateau v. Minnesota Department of Public Welfare,* 356 N.W.2d 804, 810 (Minn.Ct.App.1984) (citing *Vance v. Bradley,* 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979)). The administrative law˙judge found that occupancy incentives were needed at the time Rule 52 was amended to contain costs and promote the transfer of mentally retarded persons from state institutions. It is clear that by adopting the 93 percent occupancy incentive DHS intended to reward facilities with an occupancy rate above 93 percent and to penalize those with occupancy rates below 93 percent. On the other hand, new facilities are likely to have difficulty maximizing their occupancy in the first two years. DHS could rationally conclude that new facilities are to be encouraged and therefore should not initially be subject to the 93 percent occupancy incentive which penalizes those with low occupancy rates. The classification adopted by DHS has a rational basis and there has been no denial of equal protection.

The facilities finally complain that DHS did not give advance notice that the 93 percent occupancy incentive did not apply to new facilities. This argument is without merit. Provisions applicable to new intermediate care facilities for mentally retarded persons are set forth in Rule 52. The rule is clear. No other notice is required.

### DECISION

The 93 percent occupancy incentive contained in Rule 52 B.1.a does not apply to new facilities.

Affirmed.