Town of Brookhaven et al., Appellants, v State of New York et al., Respondents.

Third Department, December 15, 1988

339

### APPEARANCES OF COUNSEL

*Rowley, Forrest & O'Donnell, P. C. (Mark T. Walsh* and *Stan L. Pritzker* of counsel), for appellants.

*Robert Abrams, Attorney-General (Michael S. Buskus* and *Peter H. Schiff* of counsel), for respondents.

### OPINION OF THE COURT

YESAWICH, JR., J.

Plaintiffs, various towns, town officials and taxpayers, brought this action seeking to have chapters 53 of the Laws of 1981, 1982, 1983 and 1984 (hereinafter the chapter laws) declared unconstitutional insofar as they require 1970 census figures and 1969 assessment rolls be used in apportioning State aid to localities for the fiscal years 1981-1982, 1982-1983, 1983-1984 and 1984-1985. The chapter laws are exceptions to the customary formula for apportioning State revenue sharing set forth in State Finance Law § 54 which provides for per capita allocation based upon, *inter alia,* the latest decennial Federal census and the assessment roll of the calendar year preceding it (State Finance Law § 54 [1] [a] [1]; [c]). Plaintiffs maintain that the Legislature, by choosing to distribute per capita State aid based upon the 1969 assessment rolls and 1970 census rather than the 1979 and 1980 figures, has violated the Equal Protection Clauses of the US and NY Constitutions *(see,* US Const, 14th Amend, § 1; NY Const, art

I, § 11) in that towns which have grown in population between 1970 and 1980 will receive less aid per capita than towns with stagnate or declining populations. Defendants moved for summary judgment which was ultimately granted. Plaintiffs appeal; we affirm.

■ ■ Preliminarily, we note that because plaintiffs challenge the constitutionality of legislative enactments rather than particular administrative conduct taken pursuant thereto, a declaratory judgment action is the proper procedural vehicle to accomplish that challenge (see, Press v County of Monroe, 50 NY2d 695, 702) and that the four-month Statute of Limitations period contained in CPLR 217 is therefore inapplicable (see, Costantakos v Board of Educ., 105 AD2d 825). Nor do we find merit in defendants' assertion that the question before us is nonjusticiable, for the dispute centers on whether the Legislature exceeded its authority as limited by the Equal Protection Clauses of our State and Federal Constitutions (see, Saxton v Carey, 44 NY2d 545, 551).

■ There is a strong presumption that statutes are constitutional, such that " 'unconstitutionality must be demonstrated beyond a reasonable doubt' " (Maresca v Cuomo, 64 NY2d 242, 250, appeal dismissed 474 US 802, quoting Wiggins v Town of Somers, 4 NY2d 215, 218). Since neither a suspect classification nor a fundamental right is called into issue by plaintiffs' equal protection claim, the subject provisions of the chapter laws will pass constitutional muster if they can be said to rationally further a legitimate State purpose (see, Vance v Bradley, 440 US 93, 97). Significantly, the rationale justifying that purpose may be based upon "any reasonable known or conceivable state of facts" (Matter of Davis, 57 NY2d 382, 389). Thus, if defendants can demonstrate a perceived legitimate State objective that will be promoted by the legislative provisions under attack, they are entitled to summary judgment (see, Maresca v Cuomo, supra, at 251).

In support of their motion for summary judgment, defendants submitted an affidavit by R. Wayne Diesel, Director of the State Division of the Budget (hereinafter DOB), the agency responsible for drafting appropriation language for the revenue sharing program and which drafted the local assistance bills providing for use of 1970 census data and 1969 assessment rolls instead of using more recent figures. The Diesel affidavit furnishes an acceptable rationale, based upon a reasonably conceivable state of facts, for the legislation in question.

According to Diesel, one of the primary goals of revenue sharing is stabilization or reduction of local property taxes. As a consequence, distribution of State aid is based upon several factors other than population, such as jurisdictional class (e.g., county, city or town). Not the least of these considerations is the locality's tax burden and the effect any particular distribution of aid would have upon the State as a whole or on various parts thereof. When the 1980 census data became available, DOB grew concerned about the effect that reduction of aid would have upon some 550 localities that had suffered a loss in population, including 117 towns. Although DOB's ongoing monitoring of the fiscal affairs of local governments provides it with a working knowledge of the budgetary conditions of local governments, in-depth analysis was deemed necessary before resorting to the more contemporary population figures for distribution of per capita aid. Since intensive analysis of over 500 localities was impracticable, DOB focused on several of the State's more populous localities (hereinafter the selected localities) which would lose State aid if 1980 census data were substituted for 1970 census data; all of the selected localities are cities. While the various analytical tools employed by DOB are creative and engrossing, the short answer is that cities experiencing recent drop-offs in population were, by and large, in a state of financial distress due to shrinking tax bases which were not accompanied by a concomitant reduction in need for public services. On the other hand, localities with growing populations enjoyed tax bases that expanded more rapidly than the demand for public services. Thus, the relative need for State assistance was greater in localities with falling populations.

DOB concluded that use of 1980 census data in calculating per capita State aid "could have precipitated severe local budget difficulties", triggering "deep cuts in services" or causing "increases in property tax burdens that were already far above average", which in turn could have "hastened out-migration of businesses and residents and impaired economic development efforts in these communities and the State" as a whole. At the extreme, it was tenable that communities could have been threatened with default, thus shaking the confidence of credit markets in the bond and note obligations of localities across the State. Accordingly, Diesel suggests that the Legislature envisioned the use of 1969 assessments and 1970 population as a simple, if perhaps crude, means of supplementing per capita State aid to localities experiencing

serious economic adversity, as manifested by population loss, at the expense of those localities that were prospering in the wake of a population boom.*

Plaintiffs argue that the proposed rationale is irrelevant because it compares towns with cities when their equal protection claim is based upon the disparity of per capita State aid rates between towns that gained and towns that lost population between 1970 and 1980. For instance, one of the analytical tools DOB relies upon is whether a municipality's tax limit is exhausted. Because towns, unlike cities, villages and counties, have no constitutional limit on the per cent of real property value that may be taxed (see, NY Const, art VIII, § 10), plaintiffs argue that this concept is not applicable to towns. However, the fact that, in the abstract, towns have no limit on the extent to which property can be taxed does not change the asserted legislative finding, arrived at by using this tool, that all but one of the selected localities, which had lost population, suffered heavy property tax burdens. We see this as a relevant consideration given the fact that the goal of revenue sharing is to stabilize or reduce local property tax burdens throughout the State. It strikes us as not unreasonable to conclude, by analogy, that if cities with waning populations have relatively high property tax rates, then towns with declining populations do, too.

Plaintiffs also complain that Diesel mixes "apples and oranges" by comparing the full value tax rate of cities with declining populations to the full value tax rate of plaintiffs' towns. He was not meeting plaintiffs' constitutional challenge head-on, but rather was attempting to show that an additional reason for utilizing the older population figures was that towns stood to gain as a group from using the more recent figures while cities as a group were more needy. The problems of government being practical ones, equal protection does not require that all towns be treated alike but allows for inequities, provided, of course, that there is a legitimate reason for them (see, Dandridge v Williams, 397 US 471, 485). Moreover, Diesel's full value per capita calculations indicate that, in-

---

* As an added reason for not using the 1980 census, Diesel points to the belief shared by DOB and elsewhere in State government that the 1980 census undercounted New Yorkers by over 400,000. Because of litigation initiated by the State to have the 1980 numbers adjusted upward, DOB was reluctant to tie State aid allocations to figures that would have changed had the State succeeded in its lawsuit against the Bureau of Census.

deed, plaintiffs' towns have a greater capacity for raising property tax revenue than the average New York town.

Finally, two cases cited by plaintiffs are patently inapposite. *Weissman v Evans* (56 NY2d 458) dealt with a wage disparity premised upon geographic location alone, clearly an illegitimate basis for differentiation. Here the basis is not geography but relative need, a quite legitimate distinction. And *Levy v Parker* (346 F Supp 897, *affd without opn* 411 US 978) involved an irrational revenue distribution scheme which funneled most of the aid to the localities least in need of it, a circumstance just contrary to that prevailing in the case at hand.

We conclude that the rationales offered by defendants furnish reasonable justification for the enactments in question and warrant our hypothesizing that these were motivations our legislators had in mind when they voted upon those bills *(see, Maresca v Cuomo,* 64 NY2d 242, *supra).* Plaintiffs may not be heard to say that the Legislature could have accomplished the same goals in a better or different way or that it should have obtained more information before making its decision. These arguments should have been directed to the Legislature when it was considering these laws. Beyond that, it is worth noting that it is not necessary that the revenue sharing methodology availed of by the State be indisputably preeminent, but only that it be rational.

CASEY, J. P., WEISS, MIKOLL and LEVINE, JJ., concur.

Judgment affirmed, without costs.