61 F.3d 1563
 68 Fair Empl.Prac.Cas. (BNA) 679,
66 Empl. Prac. Dec. P 43,649
Kenneth D. RIGGIN, Charles Farmer, Nicholas Garito, Sr.,
Edmund Goddard, William Hummer, James Kennedy,
Fredrick Schafer, James Snyder, Thomas
Williams, and Robert F.
Ansell, Petitioners,
v.
OFFICE OF SENATE FAIR EMPLOYMENT PRACTICES, Respondent,
and
Office of the Senate Sergeant At Arms, Intervenor.
 No. 94-6004.
 United States Court of Appeals,
Federal Circuit.
 July 31, 1995.
 
 Donald R. Dinan, O'Connor & Hannan, Washington, DC, argued for petitioners. With him on the brief was James Fairbairn.
 Claire M. Sylvia, Asst. Senate Legal Counsel, Washington, DC, argued for respondent. With her on the brief were Michael Davidson, Senate Legal Counsel, Ken U. Benjamin Jr., Deputy Senate Legal Counsel and Morgan J. Frankel, Asst. Senate Legal Counsel.
 Timothy W. Milett, Senate Asst. Counsel for Employment, Office of the Senate Sergeant At Arms, Washington, DC, argued for intervenor. With him on the brief were Jean M. Manning, Senate Chief Counsel for Employment and Roy A. Sheetz, Senate Asst. Counsel for Employment.
 Before PLAGER, CLEVENGER, and BRYSON, Circuit Judges.
 BRYSON, Circuit Judge.
 
 
 1
 Ten former members of the United States Capitol Police challenge the statutory provision requiring that Capitol Police officers retire upon reaching age 55. A hearing board of the Office of Senate Fair Employment Practices held that the statute in question was validly applied to the petitioners, and the Senate Select Committee on Ethics agreed. We affirm.
 
 
 2
 * The Capitol Police Retirement Act (CPRA), as enacted in 1990, required members of the Capitol Police who were eligible for retirement to retire upon reaching age 55. The effective date of the Act was postponed for two years, so that in October 1992, any Capitol Police officer who was 55 or older and had 20 years of service was forced to retire unless the Capitol Police Board granted the officer a special exemption from automatic separation. 5 U.S.C. Secs. 8335(d), 8425(b) (1988 & Supp. II 1990). In 1994, the statute was amended to raise the mandatory retirement age to 57. 5 U.S.C. Secs. 8335(d), 8425(c) (1994).
 
 
 3
 Following the enactment of the CPRA, a group of Capitol Police officers who were on the Senate payroll and were faced with mandatory retirement filed complaints with the Office of Senate Fair Employment Practices protesting the application of the mandatory retirement provision to them. Their principal contention was that the prohibition against age discrimination in the Government Employee Rights Act of 1991 (GERA), 2 U.S.C. Sec. 1202(2), effectively repealed the mandatory retirement provision of the CPRA.
 
 
 4
 A designated hearing board of the Office of Senate Fair Employment Practices denied relief. In its opinion, the board explained that Section 302 of the GERA, 2 U.S.C. Sec. 1202, which gave the employees a statutory right to be free from age discrimination, did not override the mandatory retirement provisions of the CPRA. The board found no reason to suppose that Congress intended in 1991 to repeal by implication the mandatory retirement provisions of the CPRA, which were enacted only one year earlier.
 
 
 5
 The board noted that the complainants had also challenged the mandatory retirement provisions on due process grounds. The board concluded, however, that its jurisdiction was limited to determining whether an employee had suffered a violation within the meaning of Section 302 of the GERA, 2 U.S.C. Sec. 1202, and did not extend to constitutional challenges to particular employment actions.
 
 
 6
 The Senate Select Committee on Ethics agreed with the board that "the CPRA was not repealed by, and does not violate, the Government Employee Rights Act of 1991." The Committee therefore affirmed the order of the hearing board, and the petitioners sought review in this court. See 2 U.S.C. Sec. 1209(c).
 
 II
 
 7
 The petitioners renew their claim that the mandatory retirement provisions of the CPRA were effectively repealed by the GERA, even though the latter statute is silent with respect to its effect on the former. We agree with the hearing board that the GERA did not repeal the mandatory retirement provisions of the CPRA, and that the mandatory retirement provisions of the CPRA were therefore properly applied to the petitioners.
 
 
 8
 It is a familiar canon of statutory construction that repeals by implication are disfavored. Traynor v. Turnage, 485 U.S. 535, 547, 108 S.Ct. 1372, 1381, 99 L.Ed.2d 618 (1988); Radzanower v. Touche Ross & Co., 426 U.S. 148, 154, 96 S.Ct. 1989, 1993, 48 L.Ed.2d 540 (1976); Morton v. Mancari, 417 U.S. 535, 549-50, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1974). When statutes appear to conflict, courts will endeavor to read them consistently and will not find a narrow statute "submerged by a later enacted statute covering a more generalized spectrum" unless the later statute "expressly contradict[s] the original act" or unless such a construction "is absolutely necessary" in order for the later statute to have any meaning at all. Radzanower, 426 U.S. at 153, 96 S.Ct. at 1992-93; see United States v. Fausto, 484 U.S. 439, 453, 108 S.Ct. 668, 676-77, 98 L.Ed.2d 830 (1988) ("it can be strongly presumed that Congress will specifically address language on the statute books that it wishes to change").
 
 
 9
 The task of reconciling the two statutes at issue in this case is not a difficult one. Contrary to the petitioners' contention, the GERA is the more general statute and the CPRA is the more specific: the GERA extends employment discrimination statutes to Senate employees generally, while the mandatory retirement provisions of the CPRA speak to a specific employment issue as it affects a specific group of congressional employees. Thus, the mandatory retirement provisions of the CPRA simply establish a narrow exception to the general rule, set forth in the GERA, that Senate employees are protected against age discrimination in employment.
 
 
 10
 The Supreme Court's decision in Morton v. Mancari, supra, provides a close analogy. In that case, the Supreme Court held that specific legislation requiring that Indians be given preference for employment with the Bureau of Indian Affairs was not implicitly repealed by the Equal Employment Opportunity Act of 1972. The Court found that the two statutes could readily coexist, and that "[w]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of priority of enactment." 417 U.S. at 550-51, 94 S.Ct. at 2483.
 
 
 11
 As in Morton, an examination of the legislative background shows that there is no reason to suppose that Congress intended the general statute--the age discrimination provision of the GERA--to repeal the earlier-enacted but more specific statute--the mandatory retirement provisions of the CPRA. Beginning in the 1940s, Congress adopted a series of measures providing early retirement rights to federal law enforcement officers and firefighters. See Act of July 11, 1947, ch. 219, 61 Stat. 307 (FBI agents with 20 years of service permitted to retire at 50); Act of July 2, 1948, ch. 807, 62 Stat. 1221, 1221-22 (similar treatment provided for other federal law enforcement officers); Pub.L. No. 84-854, Sec. 401, 70 Stat. 736, 749 (1956) (similar treatment for employees at federal correctional facilities); Pub.L. No. 92-382, 86 Stat. 539 (1972) (similar treatment for federal firefighters). In 1974, Congress chose to balance the early retirement options for executive branch law enforcement officers with a mandatory retirement provision requiring that such officers retire at age 55 if they have 20 years of service at that time. See Pub.L. No. 93-350, Sec. 4, 88 Stat. 355, 356 (1974). The purpose underlying the mandatory retirement provisions was to ensure "the maintenance of relatively young, vigorous, and effective law enforcement and firefighting workforces," a goal that the early retirement option by itself had not achieved. See H.R.Rep. No. 463, 93d Cong., 1st Sess. 2 (1973).
 
 
 12
 During the same year that it enacted the mandatory retirement provisions for law enforcement officers, Congress extended the Age Discrimination in Employment Act (ADEA), 29 U.S.C. Secs. 621-34, to federal executive branch employees. Pub.L. No. 93-259, 88 Stat. 55, 74-75 (1974). Four years later, Congress amended the ADEA to make mandatory retirement unlawful for most federal employees, while leaving the mandatory retirement statutes for federal law enforcement officers in effect. Pub.L. No. 95-256, Sec. 5(c), 92 Stat. 189, 191 (1978). See generally Johnson v. Mayor & City Council of Baltimore, 472 U.S. 353, 363-70, 105 S.Ct. 2717, 2722-26, 86 L.Ed.2d 286 (1985) (ADEA co-exists with federal mandatory retirement provisions for law enforcement officers); Palmer v. Ticcione, 576 F.2d 459, 465 n. 7 (2d Cir.1978) (same), cert. denied, 440 U.S. 945, 99 S.Ct. 1421, 59 L.Ed.2d 633 (1979); Bowman v. Department of Justice, 510 F.Supp. 1183, 1186 (E.D.Va.1981) (same), aff'd, 679 F.2d 876 (4th Cir.), cert. denied, 459 U.S. 1072, 103 S.Ct. 494, 74 L.Ed.2d 635 (1982); H.R.Rep. No. 756, 99th Cong., 2d Sess. 6 (1986), U.S.Code Cong. & Admin.News 1986, pp 5628, 5632 (even after 1978 amendment to ADEA, separate mandatory retirement laws for federal law enforcement officers and firefighters remained in effect).
 
 
 13
 In 1990, Congress enacted the CPRA, which brought the retirement system for the Capitol Police into line with the retirement systems for other federal law enforcement agencies. The CPRA authorized members of the Capitol Police with 20 years of experience to retire at age 50; it increased the annuities payable to Capitol Police retirees; and it required members of the Capitol Police who were eligible for retirement to retire at age 55, absent special circumstances. Pub.L. No. 101-428, 104 Stat. 928 (1990). Later that year, Congress raised the mandatory retirement age to 57 for other executive branch law enforcement officers, Pub.L. No. 101-509, Sec. 409(a), 104 Stat. 1389, 1468 (1990), and four years later Congress amended the CPRA to adopt the same mandatory retirement age for members of the Capitol Police, Pub.L. No. 103-283, Sec. 307, 108 Stat. 1423, 1441-42 (1994). That amendment followed a 1992 amendment to the CPRA that corrected a technical error in the language of the statute. Pub.L. No. 102-378, Secs. 2(60), 2(67), 106 Stat. 1346, 1354 (1992).
 
 
 14
 The GERA was enacted in 1991, the year after the CPRA and before both the 1992 and 1994 CPRA amendments. The GERA extended various employment discrimination laws, including the prohibition against age discrimination in federal employment, to all employees of the Senate. See 2 U.S.C. Sec. 1202(2).
 
 
 15
 In early 1995, Congress enacted the Congressional Accountability Act, Pub.L. No. 104-1, 109 Stat. 3, which made a number of federal statutes, including the ADEA, applicable to the entire legislative branch. See id. Sec. 201(b)(2), 109 Stat. 7. A savings clause, id. Sec. 506(a)(1), 109 Stat. 42, ensured that claims under the GERA would not abate with the enactment of the Accountability Act and made the GERA the exclusive remedy for such claims that accrued before the effective date of the Accountability Act.
 
 
 16
 Two points emerge from this survey of the legislative background. First, just as the ADEA does not conflict with or invalidate the mandatory retirement provisions applicable to other federal law enforcement officers, the GERA does not conflict with or invalidate the mandatory retirement provisions of the CPRA. The mandatory retirement scheme for the Capitol Police is identical to the mandatory retirement scheme for executive branch law enforcement officers, and the specific age discrimination prohibition applicable to the two groups, 29 U.S.C. Sec. 633a, is also the same. It would make no sense to hold that the mandatory retirement scheme for other law enforcement officers can co-exist with the federal age discrimination law, while the mandatory retirement scheme for the Capitol Police cannot.
 
 
 17
 The parallelism between the two sets of statutes is reinforced by 2 U.S.C. Sec. 1207(i), the provision of the GERA directing that precedents under the employment discrimination laws should be used in construing the GERA. Because the mandatory retirement provisions for other federal law enforcement officers have been held compatible with the ADEA, application of the same precedents to the CPRA provides further support for the conclusion that the mandatory retirement provisions for the Capitol Police have not been repealed.
 
 
 18
 Second, any doubt that the mandatory retirement provisions of the CPRA survived the GERA is put to rest by the fact that after the enactment of the GERA, Congress twice amended the mandatory retirement provisions of the CPRA. In particular, the 1994 amendment, which raised the mandatory retirement age to 57, is flatly inconsistent with any suggestion that by enacting the GERA Congress intended to outlaw mandatory retirement for the Capitol Police. In addition, Congress in 1992 authorized lump-sum payments for accrued leave to be made to Capitol Police officers who were facing retirement as of the 1992 effective date of the CPRA's mandatory retirement provisions. See Pub.L. No. 102-397, Sec. 202, 106 Stat. 1949, 1951 (1992). Congress would not have enacted such legislation if it had regarded the mandatory retirement program of the CPRA as repealed. It is thus clear from subsequent legislation that Congress viewed the mandatory retirement provisions of the CPRA as having survived the GERA, just as the mandatory retirement provisions applicable to other federal law enforcement officers had survived the ADEA.
 
 
 19
 In arguing that the GERA effectively repealed the mandatory retirement provisions of the CPRA, the petitioners rely heavily on statements by several Senators that under the GERA all employees of the Senate would enjoy the same rights as other federal employees. See 137 Cong.Rec. S15,371-72 (daily ed. Oct. 29, 1991) (statement of Sen. Mitchell); id. at S15,379 (daily ed. Oct. 29, 1991) (statement of Sen. Metzenbaum); id. at S15,453 (daily ed. Oct. 30, 1991) (statement of Sen. Grassley). Those statements, however, were made in the context of a debate over whether the GERA should be applied to all Senate employees or only to non-legislative employees. The statements made in support of that view are not relevant to the question whether the GERA should be read to override the mandatory retirement provisions of the CPRA.
 
 
 20
 More compelling legislative evidence supports the opposite conclusion: that the GERA did not repeal the mandatory retirement provisions applicable to the Capitol Police. In 1992, for example, legislation was introduced to extend the effective date of the mandatory retirement provisions of the CPRA by three years. See H.R. 4910, 102d Cong., 2d Sess. In 1993, a House Committee report on a bill to amend the ADEA expressed the understanding that "the Capitol Police ... and many other categories of Federal public safety personnel are subject to ... mandatory retirement ages." H.R.Rep. No. 314, 103d Cong., 1st Sess. 3 (1993). Finally, in 1994 efforts were made to repeal or block enforcement of the mandatory retirement provisions as applied to the Capitol Police. Senator Metzenbaum introduced a bill to repeal the mandatory retirement provisions of the CPRA. See S.1984, 103d Cong., 2d Sess. And Senator Jeffords sought to bar the use of funds to enforce the mandatory retirement provision with respect to the Capitol Police. Senator Jeffords noted at the time that the GERA had outlawed "age discrimination and mandatory retirement ... for all congressional employees--all congressional employees, that is, except the Capitol Police." 140 Cong.Rec. S7045 (daily ed. June 16, 1994). None of those efforts succeeded, but each evidenced an understanding that the mandatory retirement provisions of the CPRA were still in effect.
 
 
 21
 In sum, the legislative background and subsequent legislative action addressing the mandatory retirement provisions of the CPRA make it plain that Congress did not regard those provisions as repealed by the GERA. We therefore conclude that the CPRA and the GERA can and should be read compatibly, that Congress did not intend the GERA to repeal the CPRA, and that the petitioners are subject to the CPRA's mandatory retirement provisions.
 
 III
 
 22
 The petitioners also contend that the hearing board should have entertained their constitutional challenge to the CPRA and that this court should remand the case to the hearing board with instructions to address that claim. The petitioners argue that the mandatory retirement provisions of the CPRA violate the equal protection component of the Due Process Clause of the Fifth Amendment. The hearing board regarded that constitutional question as outside its jurisdiction and refused to address it.
 
 
 23
 * The hearing board reasoned that (1) Section 307(g) of the GERA, 2 U.S.C. Sec. 1207(g), authorizes hearing boards to determine whether a violation of the Act has occurred; (2) Section 301(c)(3) of the Act, 2 U.S.C. Sec. 1201(c)(3), defines a "violation" as a practice that violates Section 302 of the Act; and (3) Section 302 provides that personnel actions shall be free from discrimination based on age, within the meaning of Section 15 of the ADEA, 29 U.S.C. Sec. 633a. The GERA, the board observed, does not define a violation to include conduct that is contrary to constitutional provisions.
 
 
 24
 The hearing board's analysis was correct as far as it went, but we believe the hearing board was too quick to disclaim jurisdiction over the petitioners' constitutional challenge to the CPRA. While it is true that the board's statutory grant of authority is limited to determining whether a claimant has suffered a violation of one of the employment discrimination statutes listed in Section 302 of the GERA, the petitioners' constitutional challenge to the CPRA bears directly on whether they have a valid statutory discrimination claim. It is the mandatory retirement provisions of the CPRA that defeat the petitioners' claim under the age discrimination provision of Section 302 of the GERA. If the mandatory retirement provisions of the CPRA are invalid, whether for constitutional reasons or otherwise, the petitioners would likely have a viable statutory age discrimination claim. Accordingly, the petitioners' constitutional challenge to the CPRA was within the jurisdiction of the hearing board, not because the hearing board has a special commission to decide constitutional issues but because the constitutionality of the CPRA bears directly on the question that the hearing board clearly has jurisdiction to decide: whether the petitioners' rights under Section 302 of the GERA have been violated.
 
 
 25
 In support of the hearing board's disclaimer of jurisdiction over the constitutional issue, the respondent cites the general rule that administrative agencies do not have jurisdiction to decide the constitutionality of congressional enactments. See, e.g., Weinberger v. Salfi, 422 U.S. 749, 765, 95 S.Ct. 2457, 2466-67, 45 L.Ed.2d 522 (1975); Johnson v. Robison, 415 U.S. 361, 368, 94 S.Ct. 1160, 1166, 39 L.Ed.2d 389 (1974); Public Utilities Comm'n v. United States, 355 U.S. 534, 539, 78 S.Ct. 446, 450, 2 L.Ed.2d 470 (1958); Oestereich v. Selective Service System Local Bd. No. 11, 393 U.S. 233, 242, 89 S.Ct. 414, 419, 21 L.Ed.2d 402 (1968) (Harlan, J., concurring). That rule, however, "is not mandatory," but is subject to Congress's allocation of adjudicative responsibility. Thunder Basin Coal Co. v. Reich, --- U.S. ----, ----, 114 S.Ct. 771, 780, 127 L.Ed.2d 29 (1994). A finding that the agency lacks jurisdiction to decide constitutional questions is especially likely when the constitutional claim asks the agency to act contrary to its statutory charter, see Weinberger v. Salfi, supra; Johnson v. Robison, 415 U.S. at 367, 94 S.Ct. at 1165-66; Public Utilities Comm'n v. United States, supra, or when the consequence of committing the issue to the agency would be to deny judicial review of the constitutional claim, see Califano v. Sanders, 430 U.S. 99, 109, 97 S.Ct. 980, 986, 51 L.Ed.2d 192 (1977); Johnson v. Robison, 415 U.S. at 368-69, 94 S.Ct. at 1166-67. In this case, the constitutional issue does not require the agency to question its own statutory authority or to disregard any instructions Congress has given it. Rather, the constitutional question is presented as part of the petitioners' claim of entitlement to the statutory relief that the hearing board is authorized to grant them. And permitting the hearing board to address constitutional claims that arise in the course of the board's performance of its statutory duties does not foreclose subsequent judicial review of those claims.
 
 
 26
 We think it clear that, in deciding whether an employee is entitled to relief under Section 302 of the GERA, the hearing board would be entitled to address questions such as whether the First Amendment or the Speech or Debate Clause provides a complete defense to a particular claim of employment discrimination. The fact that those defenses are constitutionally based would not disable the board from fulfilling its responsibility to decide the statutory claim presented to it. See Thunder Basin Coal Co. v. Reich, --- U.S. at ----, 114 S.Ct. at 780 (Federal Mine Safety and Health Review Commission addresses due process claims); NLRB v. Catholic Bishop of Chicago, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979) (NLRB addresses First Amendment objection to exercise of its statutory jurisdiction); Note, The Authority of Administrative Agencies To Consider the Constitutionality of Statutes, 90 Harv.L.Rev. 1682, 1687-88 (1977). The same principle applies here. Because addressing the constitutional challenge to the mandatory retirement provisions of the CPRA is consistent with, rather than contrary to, the board's congressionally conferred authority to decide statutory age discrimination claims, it is fair to infer that Congress did not intend to deny the board the authority to address constitutional issues.
 
 
 27
 We are fortified in our view of the hearing board's jurisdiction (and ultimately this court's jurisdiction) over the petitioners' constitutional claim by three distinctive features of the GERA. First, Congress made quite clear in enacting the GERA that it wanted all questions arising from employment discrimination claims under the GERA to be subject to judicial review. The judicial review provisions of the GERA were the product of a compromise between those who believed that Senate employees should be given the complete rights to district court litigation enjoyed by executive branch employees and those who opposed any judicial review at all. The compromise position, which ultimately prevailed, provided for judicial review only at the appellate court level, but ensured that this court would have jurisdiction to address "all relevant issues of law" arising from the underlying claim and to "interpret constitutional and statutory provisions." 2 U.S.C. Sec. 1209(c); see 137 Cong.Rec. S15,371 (daily ed. Oct. 29, 1991) (statement of Sen. Grassley); id. at S15,372-73 (statement of Sen. Mitchell) (standard of review by Federal Circuit similar to that ordinarily applicable under the Administrative Procedure Act); 137 Cong.Rec. S15,453 (daily ed. Oct. 30, 1991) (statement of Sen. Hatch); id. (statement of Sen. Grassley). The grant of authority to this court to address constitutional questions when reviewing final decisions under the GERA suggests that the hearing board was intended to have the authority to address those issues in the first instance.
 
 
 28
 Second, the GERA provided that Senate employees could not "commence a judicial proceeding" to redress the practices prohibited by Section 302 except as provided by the GERA itself. 2 U.S.C. Sec. 1216. That statutory provision signifies that Congress did not intend to permit federal district courts to address questions that might fall outside the jurisdiction of the hearing board and this court on review. Because there is a strong presumption that constitutional claims are judicially reviewable in some forum, see Webster v. Doe, 486 U.S. 592, 603, 108 S.Ct. 2047, 2053-54, 100 L.Ed.2d 632 (1988); Davis v. Passman, 442 U.S. 228, 242, 99 S.Ct. 2264, 2275, 60 L.Ed.2d 846 (1979), GERA's restriction of judicial review to this court suggests that Congress intended constitutional claims arising in the course of GERA proceedings to be within the competence of the hearing board and of this court on review.
 
 
 29
 Finally, it is important to note that the GERA does not provide for direct review of the hearing board by this court, but interposes the Senate Select Committee on Ethics as the ultimate congressional arbiter of GERA claims, through its statutory responsibility to review hearing board decisions. 2 U.S.C. Sec. 1208. Whatever reluctance Congress might have to commit constitutional questions to an ordinary administrative agency would not appear to extend to a body such as a hearing board that is functioning under the direct supervision of a Senate Committee. Should the hearing board engage in constitutional adventurism, the Ethics Committee would be able to ensure prompt correction of the board's error. We therefore conclude that Congress did not intend, through the GERA, to deprive the hearing board, the Ethics Committee, and this court of jurisdiction to address constitutional questions that may arise incident to the resolution of a claim arising under Section 302 of the GERA.
 
 B
 
 30
 Although we believe the board should have addressed the petitioners' constitutional claim, its failure to do so does not require a remand. The issue is purely a question of law, and it is within this court's jurisdiction, in reviewing GERA appeals, to "decide all relevant questions of law and interpret constitutional and statutory provisions." Moreover, the issue is a straightforward and simple one that would not justify the time and effort involved in a remand.
 
 
 31
 In Massachusetts Board of Retirement v. Murgia, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976), the Supreme Court upheld, against an equal protection challenge, a state statute requiring police officers to retire at age 50. There is no plausible basis for distinguishing this case from Murgia, or from the Supreme Court's subsequent decision in Vance v. Bradley, 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979), in which the Court rejected an equal protection challenge to a mandatory retirement statute applicable to foreign service officers. The petitioners' challenge to the mandatory retirement provisions of the CPRA claim based on the equal protection component of the Due Process Clause is therefore without merit.
 
 C
 
 32
 In their brief, the petitioners raise a second constitutional claim--that the Ethics Committee violated the petitioners' right to due process by not providing a sufficiently detailed written statement of its reasons for upholding the hearing board's decision. The short answer to this claim is that the Committee provided a written statement for its action that was adequate to satisfy any requirements imposed by the GERA, see 2 U.S.C. Sec. 1208(e), the Committee's own rules, see Ethics Committee Interim Procedures Rule 4.3, 138 Cong.Rec. S17,065 (daily ed.), or the Due Process Clause, see Goldberg v. Kelly, 397 U.S. 254, 271, 90 S.Ct. 1011, 1022, 25 L.Ed.2d 287 (1970); Harris v. Rivera, 454 U.S. 339, 344, 102 S.Ct. 460, 463-64, 70 L.Ed.2d 530 (1981) (occasions on which due process requires an explanation of the reasons for a decision "are the exception rather than the rule"). Although the "decision" portion of the Committee's opinion was short, it was sufficient to explain the reasons for the Committee's action, particularly in light of the thorough opinion prepared by the hearing board and the purely legal nature of the issue in dispute.
 
 
 33
 AFFIRMED.