Denis C.F. YAP, Plaintiff,

v.

Rodney E. SLATER, in his Capacity as the Secretary of the United States Department of Transportation, Defendant.

No. CIV. 99–458 ACK.

United States District Court,
D. Hawai'i.

Oct. 5, 2000.

---

9. Defendant's prior attorney, in the Answer, admitted as true the Complaint's contention that Defendant was a U.S. citizen.

Clayton C. Ikei, Honolulu, HI, for Denis C.F. Yap, plaintiffs.

Thomas A. Helper, Office of the United States Attorney, Honolulu, HI, for Rodney E. Slater, in his Capacity as the Secretary of the United States Department of Transportation, defendants.

### ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

KAY, District Judge.

### BACKGROUND

Denis C.F. Yap ("Plaintiff") worked as an air traffic controller ("ATC") and was forced to retire when he turned 56. In the instant lawsuit, he protests the Federal Aviation Administration ("FAA") requirement that he retire at age 56, while other ATCs are allowed to work past age 56. Plaintiff sues Rodney E. Slater ("Defendant" or "the Secretary") in his capacity as the Secretary of the United States Department of Transportation. Plaintiff's complaint alleges violations of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (1994) ("ADEA"), and his right to equal protection under the Fifth Amendment.[1] This motion was originally a motion for judgment on the pleadings. *See* Fed.R.Civ.P. 12(c); Mot., at 1. However, matters outside the pleadings have been presented for the Court's review and therefore, the Court will treat the motion as one for partial summary judgment. *See* Fed.R.Civ.P. 12(c).[2] The Court will set forth the mandatory retirement provisions in issue and then turn to the claims.

### I. STATUTORY FRAMEWORK

Three different mandatory retirement schemes exist for ATCs employed by the FAA. The first group of ATCs are those

---

1. Plaintiff's third claim for relief is for unlawful retaliation. Defendant did not move for judgment on the pleadings on this claim.

2. The parties were notified that the motion would be considered one for partial summary judgment and agreed to such at the hearing on the motion.

hired before May 16, 1972. For these ATCs there is no mandatory retirement age so long as they remain members of the Civil Service Retirement System ("CSRS"), one of the retirement benefit plans administered by the Government. *See* 5 U.S.C. § 8335 note; Opp., Ex. D, at 2.

The second group of ATCs are those hired between May 16, 1972 and December 31, 1986 who are members of CSRS. In 1972, Congress enacted Public Law 92–297, codified at 5 U.S.C. § 8335 (1994). It states in relevant part:

> An air traffic controller *shall be separated from the service on the last day of the month in which he becomes 56 years of age.* The Secretary[3], under such regulations as he may prescribe, *may* exempt a controller having exceptional skills and experience as a controller from the automatic separation provisions of this subsection until that controller becomes 61 years of age.

5 U.S.C. § 8335(a) (emphasis added) (footnote added). The stated purpose of the mandatory retirement age was,

> to improve the conditions of employment for individuals employed as air traffic controllers in the Department of Transportation by offering preferential retirement benefits, job training and improved appeal procedures for controllers removed from control work, and the establishment of maximum recruitment and retention ages for controllers.

S.Rep. No. 92–774 (1972), *reprinted in* 1972 U.S.C.C.A.N. 2287, 2287. The report observed that,

> [A]ir traffic controllers are unique in that their work involves both physical and mental strain for the controller, and the safety of the public traveling by air. At large air terminals and en route centers in the United States, the role and importance of the controller is primary a

status to which airline pilots are the first to testify. Over a period of time the physical and mental efforts of monitoring radar screens to track all aircraft within the range of a regional facility or tower or controlling tower traffic visually, or both, simply becomes too much for the average individual to sustain. Like skilled athletes, most controllers lose proficiency to some degree after age 40, and in the interest of the public's safety, should not be retained as controllers in busy facilities beyond the time they can perform satisfactorily.

*Id.* at 2288. Besides implementing a mandatory retirement age, Public Law 92–297 recognized that the retirement benefit rules for other civil servants "are too strict when applied to air traffic controllers," many of whom burn out before meeting the requisite age and year in service requirements. *See id.* at 2289 ("Although there are some exceptions to the general rule, most controllers are not able to control traffic in busy facilities at any age near 55—the physical and emotional strength required to do the job, to work odd and continuously changing work shifts, and to insure air safety for the traveling public is simply too much for any man in that age bracket."). Accordingly, the new law eased the age and year in service requirements for air traffic controllers, giving them a "preferential system." *See id.* ("The committee recognizes that selecting air traffic controllers for preferential retirement treatment constitutes a significant change of policy for the civil service retirement system, but the unique employment of these employees justifies such a system. No other Government worker is so directly involved in the safety of millions of dollars of aviation equipment used to transport the public."). The new law also recognized that retirement at 56 would be stressful as ATC job skills are not easily transferable to other jobs. The law therefore made job training

---

**3.** For the purposes of this section, "Secretary" means the Secretary of Transportation.

*See* 5 U.S.C. § 2109(2).

available. *See id.* at 2288 ("This training opportunity will remove much of the natural anxiety which controllers now feel when they are asked to step aside from active control work."). Finally, § 8 of Public Law 92–297 expressly provided that what is now codified as § 8335(a)[4] "does not apply to a person appointed as an air traffic controller by the Department of Transportation before the date of enactment of this Act [May 16, 1972]." *See* 5 U.S.C. § 8335(a) note. Thus, while ATCs hired on or after May 16, 1972 face mandatory retirement at age 56, ATCs hired before May 16, 1972 are automatically exempted from the mandatory separation rules.[5]

Finally, the third group of ATCs are those who are members of the Federal Employee Retirement System ("FERS"), a retirement system that became effective January 1, 1987. The purposes of establishing the FERS system are set forth at the beginning of Public Law 99–335, the FERS legislation:

The purposes of this Act are—

(1) to establish a Federal employees' retirement plan which is coordinated with title II of the Social Security Act;

(2) to ensure a fully funded and financially sound retirement benefits plan for Federal employees;

(3) to enhance portability of retirement assets earned as an employee of the Federal Government;

(4) to provide options for Federal employees with respect to retirement planning;

(5) to assist in building a quality career work force in the Federal Government;

(6) to encourage Federal employees to increase personal savings for retirement; and

(7) to extend financial protection from disability to additional Federal employees and to increase such protection for eligible Federal employees.

Federal Employees' Retirement System Act of 1986, Pub.L. 99–335, § 100A, 100 Stat. 514. FERS was established as a new, distinct retirement benefit system for numerous federal employees, including ATCs. *See, e.g.,* S.Rep. No. 166, at 10 (1986), *reprinted in* 1986 U.S.C.C.A.N. 1405 ("Although there are common elements between [FERS] and the existing [CSRS], the two will generally function as separate retirement programs.... [T]he two systems are quite different in regard to the employees covered, retirement eligibility requirements, benefits, and basic design."). Included within the new FERS scheme was a provision for the mandatory separation of ATCs covered by FERS. The provision, codified at 5 U.S.C. § 8425(a), states in relevant part:

An air traffic controller who is otherwise eligible for immediate retirement under section 8412(e) *shall be separated from the service on the last day of the month in which that air traffic controller becomes 56 years of age or completes 20 years of service if then over that age.*

5 U.S.C. § 8425(a) (emphasis added). Similarly to § 8335(a), § 8425(a) contains a waiver provision. FERS has a different way of calculating retirement eligibility and benefits. There were opportunities for ATCs to switch from CSRS to FERS.[6] *See* Opp., Ex. D, at 2.

ATC under CSRS (who has no mandatory retirement requirement) would face the mandatory retirement requirements of FERS if he or she changed benefit plans.

---

**4.** The relevant provision was originally codified as subsection (f). The codification changed in Pub.L. 95–256, § 5(c)(2). *See* 5 U.S.C. § 8335 Historical and Statutory Notes.

**5.** The FAA uses the term "grandfathered" as shorthand for the exemption enjoyed by the pre-May 16, 1972 hires. This "grandfather" exemption is lost if an ATC switches from being a CSRS member to a FERS member. *See* Opp., Ex. D, E. Thus, a grandfathered

**6.** It appears from the Opposition, Ex. D, at 2, that transferring from CSRS to FERS would enable an employee to take advantage of the more flexible mandatory retirement scheme under FERS. The Court notes that Plaintiff chose not to make this switch.

In addition to mandatory retirement, of course, an ATC may be removed from service for physical or mental reasons. *See, e.g.,* 5 U.S.C. § 3381(a). The FAA annually tests ATCs to ensure they are healthy. *See, e.g.,* Opp., Ex. J, at 5, 10 ("It is in the interest of the agency to develop and maintain the best possible Air Traffic Control Specialist Workforce."); *see generally* Opp., Ex. I, at 1–2 (describing job of Aviation Medical Examiners, who are hired by the FAA to test, *inter alia,* ATCs to ensure that they meet Federal Aviation Regulations and are medically fit to perform safety-related duties).

## II. BACKGROUND OF PLAINTIFF'S CASE

There do not appear to be any facts in dispute. *See* Reply, at 2 ("Plaintiff and [the Secretary] are in agreement concerning the relevant facts."). Plaintiff was born February 19, 1943. He began working as an ATC in June of 1973. Plaintiff is a member of CSRS, not FERS. *See* Reply, Ex. A, ¶ 2. He continually served in the position of ATC for over 25 years. Plaintiff presented the Court with evidence that he passed all Aviation Medical Examinations since 1985, *see* Opp., Ex. K, and claims that he has passed all examinations since his hire.[7]

In August of 1981, many ATCs employed by the FAA engaged in an illegal strike under their former employee organization known as Professional Air Traffic Controllers' Organization (PATCO). Plaintiff did not strike, which "required [him] to cross PATCO picket lines set up at the Honolulu FAA facility, at personal risk and ridicule by his co-workers." Opp.,

at 3. In and about October of 1981, President Reagan terminated the over 11,000 PATCO members who did engage in the strike. Following the strike, President Reagan issued a memorandum permitting the terminated ATCs to apply for federal employment with any federal agency except the FAA. *See* Opp., Ex. B ("these former federal employees should not be deemed suitable for employment with the [FAA]"). The bar on hiring by the FAA lasted until August of 1993, when it was lifted by President Clinton. *See* Opp., Ex. C ("I believe sanctions have been in effect long enough and that PATCO members should be eligible to apply, without preference, when there are openings with the FAA. It is time to put this chapter of labor-management relations behind us."). Eventually, some former PATCO strikers were rehired as ATCs, including some in Honolulu. *See* Compl., at 4. Some of these former strikers are now covered by FERS and may remain employed past age 56 if they have not accumulated twenty years of service. *See* 5 U.S.C. § 8425(a). The current situation is therefore that some ATCs who did not strike are faced with mandatory retirement at age 56, while re-hired strikers face a more flexible/lenient mandatory retirement scheme under § 8425.

In a supplement to his Opposition, Plaintiff submitted evidence of an additional group of ATCs who are exempt from the mandatory retirement age of 56. These ATCs are part of the FAA's Federal Contract Tower Program ("FCTP"). *See* Supp. Opp., at 2. These ATCs are not FAA employees, but do have FAA certification which allows them to be ATCs. Basically, through the FCTP, the FAA has out-

---

**7.** Plaintiff included in his opposition the deposition of Dr. Jack H. Scaff, who is certified as a FAA Aviation Medical Examiner. *See* Opp., Ex. L, at 9. He described the process of examining ATCs as one where the medical examiner is the "eyes and ears" for the FAA, collecting raw data of health statistics from which the FAA then determines if an ATC is medically qualified to work. *See id.* at 9–10, 26. The documents in Plaintiff's Exhibit K are these "raw data" collections from 1985–1998.

Scaff testified that he could get as accurate and objective findings of an older ATC as he could of a younger ATC when doing a medical examination. *See id.* at 53–55. He also testified that a 56 year old person is more likely to have unforeseen medical problems, including cardiology problems, than a 35 year old person. *See id.* at 61–62. He then testified that doing testing beyond the FAA minimums could cut down on the "unforeseen" problems. *See id. generally* at 63–69.

sourced the ATC responsibilities at certain "Level I" (i.e., lowest level of take-off and landing) air traffic control towers across the United States. The FCTP lowered the cost of providing ATC service at these towers and also provided ATCs for towers that likely would not have been staffed at all because of expense. *See* Supp. Opp., Ex. A, at 1–3 of Executive Summary. "[A]ir traffic at Level I towers is less complex to control than air traffic at higher level towers." *Id.*, at 1. Plaintiff included depositions of two ATCs employed by a company called Serco Management Services, who operates towers under the FCTP program. One of the deponents, Henry Hong, is 70 years old and currently an ATC on Molokai. The second deponent, Donald Waialae, is 66 years old and also works as an ATC at the airport on Molokai. Both men have passed Aviation Medical Examinations in the past year as a condition of their employment. *See* Supp. Opp., at 3.

In Defendant's reply to Plaintiff's supplement, he emphasizes that the FCTP has only been used at Level I, low activity airports and that there has been no attempt or Congressional approval to implement the use of similar programs at higher level facilities. Defendant attached a declaration by Mr. Eric Harrell, who is the FAA administrator who oversees the FCTP. *See* Harrell Decl. ¶ 1. (attached to Reply Supp. Opp.). Harrell explained that the FCTP is only currently in use at Level I facilities (less than 35 operations per hour) and is not in use, for example, at Level V facilities (which average 100 or more operations per hour). Harrell explained:

> In addition to having fewer operations, [ATCs] at Level I towers rely on visual methods to control aircraft, whereas controllers at higher level towers generally use radar equipment to control air traffic. Consequently, air traffic at Level I towers is less complex to control than air traffic at higher level towers.

Harrell Decl. ¶ 2. Expansion of the FCTP is still in the investigatory phase. *See id.* ¶ 8.

On December 16, 1998, approximately two months shy of his 56th birthday, Plaintiff wrote a letter directly to Defendant asking for a waiver under § 8335(a) which would allow him to work until age 61. *See* Compl., Ex. B. Plaintiff admitted that he was not going through the "bureaucratic channels" because time was of the essence. *See id.* As justification for the waiver, Plaintiff pointed out that fired strikers who had been rehired in 1995 were allowed to work past age 56 and some had even been hired after age 56. *See id.* In a response dated January 4, 1999, the FAA explained that the Secretary "may grant a waiver to mandatory separation at age 56 in cases of exceptional skills and experience of an air traffic controller. The waiver authority is intended only for extraordinary situations. The employee must document exceptional skills and experience over the skills and experience of other controllers." *See* Compl., Ex. C. The letter then explained the waiver request process (which Plaintiff had not followed) and how three different groups of ATCs exist. *See id.* The waiver was not granted.

Plaintiff turned 56 on February 19, 1999. Being covered by CSRS and having not received a waiver, Plaintiff was required to retire.

In the first count of his complaint, Plaintiff alleges that Defendant's actions violate the ADEA. In Count II, Plaintiff alleges that "the disparate enforcement of Public Law 92–927, by the FAA, on a basis not rationally related to air transportation safety violates Plaintiff's right to equal protection of the law in violation of the Fifth Amendment." Compl., at 6.

Defendant moved for judgment on the pleadings on the equal protection and the ADEA claims on December 30, 1999. After the Court granted a continuance to allow Plaintiff to do discovery, Plaintiff filed his opposition on July 27, 2000. De-

fendant filed a timely reply on August 21, 2000. On August 23, 2000, with leave of Court, Plaintiff filed a supplement to his opposition. Finally, on September 6, 2000, Defendant filed a reply to Plaintiff's supplement. The parties were notified that the motion would be treated as one for partial summary judgment, and agreed thereto. The matter came before the Court for hearing on September 18, 2000.

## STANDARD OF REVIEW

The instant motion was originally brought as a partial motion for judgment on the pleadings. Federal Rule of Civil Procedure 12(c) allows parties to move for "judgment on the pleadings."

> After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Fed.R.Civ.P. 12(c). Matters outside the pleadings have been presented to, and not excluded by the Court and therefore, the motion shall be treated as on for summary judgment.

Summary judgment shall be granted where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c). The standard for summary adjudication is the same. *See State of Cal. v. Campbell,* 138 F.3d 772, 780 (9th Cir. 1998). One of the principal purposes of the summary judgment procedure is to identify and dispose of factually unsupported claims and defenses. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91·L.Ed.2d 265 (1986).

The United States Supreme Court has declared that summary judgment must be granted against a party who fails to demonstrate facts to establish an element essential to his case where that party will bear the burden of proof of that essential element at trial. *See id.* at 322, 106 S.Ct. 2548. "If the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact [citations omitted], the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment." *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987).

Rather, Rule 56(e) requires that the nonmoving party set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial. *See id.* at 630. At least some "significant probative evidence tending to support the complaint" must be produced. *Id.* Legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment. *See British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 952 (9th Cir.1978).

The standard for a grant of summary judgment reflects the standard governing the grant of a directed verdict. *See Eisenberg v. Ins. Co. of North America,* 815 F.2d 1285, 1289 (9th Cir.1987) (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Thus, the question is whether "reasonable minds could differ as to the import of the evidence." *Anderson,* 477 U.S. at 250–51, 106 S.Ct. 2505.

The Ninth Circuit has established that "[n]o longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *California Architectural Bldg. Products, Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th Cir.1987). Moreover, the United States Supreme Court has stated that "[w]hen the moving party has carried its burden under Rule 56(c), its oppo-

nent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Indeed, "if the factual context makes the nonmoving party's claim *implausible*, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *Franciscan Ceramics*, 818 F.2d at 1468 (emphasis in original) (citing *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348). Of course, all evidence and inferences to be drawn therefrom must be construed in the light most favorable to the nonmoving party. *See T.W. Elec. Serv.*, 809 F.2d at 630–31.

## DISCUSSION

### I. AGE DISCRIMINATION IN EMPLOYMENT ACT

Plaintiff's first cause of action is that the mandatory retirement provisions violate the ADEA. The ADEA prohibits federal agencies from engaging in age discrimination against employees over 40. "All personnel actions affecting employees or applicants for employment who are at least 40 years of age ... in executive agencies ... shall be made free from any discrimination based on age." 29 U.S.C. § 633a(a); *see also, e.g., Klein v. Secretary of Transp.*, 807 F.Supp. 1517, 1520, 1522 (E.D.Wash.1992) (rebuffed applicant for electronics technician position used § 633a(a) as statutory basis for suit for age discrimination against FAA). The ADEA makes clear that federal employees are not protected by all sections of the ADEA, only what is codified at §§ 633a and 631(b). *See* 29 U.S.C. § 633a(f) ("Any personnel action of any department, agency, or other entity referred to in subsec-

tion (a) of this section shall not be subject to, or affected by any provision of [the ADEA], other than the provisions of section 631(b) of this title and the provisions of this section."); *see also Johnson v. Mayor and City of Baltimore*, 472 U.S. 353, 356 n. 1, 105 S.Ct. 2717, 86 L.Ed.2d 286 (1985) (noting that, "Federal employees are covered in a separate section of the [ADEA] and are treated differently from nonfederal employees ....").

Despite the ADEA's prohibition on age discrimination, (which includes mandatory retirement ages) the Supreme Court has explained that when the ADEA was amended to prohibit age discrimination by the federal government, this did not render mandatory separation statutes such as § 8335 illegal. *See Johnson*, 472 U.S. at 357, 105 S.Ct. 2717.

> The 1978 Amendments eliminated substantially all federal age limits on employment, but they *left untouched several mandatory retirement provisions of the federal civil service statute applicable to specific federal occupations, including* firefighters, ***air traffic controllers,*** and law enforcement officers, as well as mandatory retirement provisions applicable to the Foreign Service and the Central Intelligence Agency.

*Id.* (emphasis added) (discussing mandatory retirement age for federal firefighters found in § 8335(b)).[8] The Court also noted that, "Congress, of course, may exempt federal employees from application of the ADEA and otherwise treat federal employees, whose employment relations it may directly supervise, differently from those of other employers ... indeed it has done so elsewhere in the ADEA." *Id.* at 366 n. 10, 105 S.Ct. 2717.

■ This Court concludes that the specific mandatory separation statute at

---

**8.** The facts of *Johnson* are not relevant to the instant case. The issue therein was whether or not the mandatory retirement age of 55 for federal firefighters meant that age was a bona fide occupational qualification ("BFOQ") for state and local firefighters such that state and

local government employers could enforce a mandatory retirement scheme. *See* 29 U.S.C. § 623(f). The Court answered this question in the negative. *See Johnson*, 472 U.S. at 358, 363, 369–70, 105 S.Ct. 2717.

§ 8335 is an exception to the more general ADEA prohibitions on age discrimination. *See Morton v. Mancari,* 417 U.S. 535, 550–51, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment."). That the mandatory separation requirements for certain federal employees are properly treated as exceptions to the ADEA has been the holding of numerous federal courts. *See, e.g., Strawberry v. Albright,* 111 F.3d 943, 947 (D.C.Cir.1997) (holding that the specific statutes creating mandatory retirement ages for Foreign Service employees are an exception to the ADEA's general age discrimination prohibition); *Palmer v. Ticcione,* 576 F.2d 459, 465 & n. 7 (2d Cir.1978) (noting that the ADEA's prohibitions have exceptions for certain federal employees, including air traffic controllers); *Bowman v. United States Dep't of Justice,* 510 F.Supp. 1183, 1186 (E.D.Va.1981), *aff'd* 679 F.2d 876 (4th Cir.1982) (finding claim by Bureau of Prisons correctional officer that the ADEA was superseded by § 8335 meritless); *cf. Riggin v. Office of Senate Fair Employment Practices,* 61 F.3d 1563, 1566–69 (Fed.Cir.1995) (holding that "just as the ADEA does not conflict with or invalidate the mandatory retirement provisions applicable to other federal law enforcement officers," the more general Government Employee Rights Act of 1991 did not repeal the mandatory retirement requirements for Capitol Police officers found in the more specific § 8335(d)).

The Court further finds that Plaintiff's citations to cases finding that employers who tried to enforce mandatory retirement ages had violated the ADEA are unavailing. *See* Opp., at 10 (citing, *inter alia, EEOC v. Kentucky State Police Dep't,* 860 F.2d 665, 667, 669 (6th Cir.1988) (ADEA violation found after court determined

mandatory retirement at age 55 is not a BFOQ for state police)). The ADEA is not applicable to air traffic controllers and therefore, cases showing an action is illegal under the ADEA are inapposite. Indeed, in *Kentucky State Police Dep't,* cited by Plaintiff, the Sixth Circuit recognized the difference between the question of whether an employer had established age as a BFOQ (and therefore was compliant with the ADEA) and whether Congress had created a mandatory retirement scheme exempt from ADEA regulation. *See* 860 F.2d at 669. After holding that Kentucky had not shown that age was a BFOQ, the court noted, "[t]here is no doubt, of course, Congress can authorize mandatory age limits." *Id.*

The Court concludes that Plaintiff has not stated a cause of action under the ADEA because the mandatory retirement scheme he falls under is exempted from the ADEA's prohibitions. No questions of material fact exist that preclude judgment for Defendant and therefore, summary judgment is entered for Defendant on Plaintiff's ADEA claim.

## II. EQUAL PROTECTION

Plaintiff also asserts a claim under the Equal Protection clause of the Fifth Amendment. He states in his complaint that, "the disparate enforcement of Public Law 92–927, by the FAA, on a basis not rationally related to air transportation safety violates Plaintiff's right to equal protection of the law in violation of the Fifth Amendment." Compl., at 6. Plaintiff argues that there are two classes of ATCs: 1) former PATCO strikers who were reinstated after 1993 and are covered by FERS and not subject to mandatory retirement at age 56[9], and 2) ATCs who did not strike in 1981 and who are forced to retire at age 56. *See* Opp., at 4. He argues that the "FAA is rewarding those very

9. As an exhibit to his opposition, Plaintiff attaches lists of former PATCO strikers who were employed in the Western Pacific Region as of March 2000. Plaintiff states that there

are approximately 80 of these "favored" employees. *See* Opp., at 5 & Ex. G, H. The list includes a number of ATCs in their upper 50s and their 60s.

persons who put the air traveling public in jeopardy by engaging in an illegal strike." *Id.* He also argues that the creation of these two classes is not reasonably related to public aviation safety. Plaintiff argues that allowing FERS members to work long enough to become eligible for federal retirement benefits (even past age 56) undermines the FAA's argument that the mandatory retirement age of Public Law 92–297 is reasonably related to air public safety. *See id.* He also argues that the FAA's public safety argument is weakened by the fact that persons over age 56 can be employed as ATCs under the FCTP. *See* Supp. Opp., at 3–4.

Defendant argues that Plaintiff's equal protection claim should fail because Congress has a rational basis for changing mandatory retirement policies so that different rules apply to different ATCs, depending on their date of hire.

## A. Level of Review

█ The first issue is what level of judicial review should be used to analyze the statutory classification complained of by Plaintiff. "[E]qual protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 312–13, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976); *see also Nunez v. City of San Diego,* 114 F.3d 935, 944 (9th Cir. 1997) (same). Conversely, " 'a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity' and must be upheld 'if there is a rational

relationship between the disparity of treatment and some legitimate governmental purpose.' " *Aleman v. Glickman,* 217 F.3d 1191, 1200 (9th Cir.2000) (quoting *FCC v. Beach Communications, Inc.,* 508 U.S. 307, 319–20, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)). Whether the classification in the instant case is looked at as strikers versus non-strikers or CSRS versus FERS employees [10], neither classification interferes with the exercise of a fundamental right nor operates to the peculiar disadvantage of a suspect class. *See, e.g., Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979) (distinction between employees covered by one retirement system and those covered by another analyzed under rational basis because it did not burden a suspect group nor a fundamental right). Accordingly, rational basis review is all that is required.[11]

## B. Evaluation of Plaintiff's Claim Under Rational Basis

The Ninth Circuit recently reiterated how a court should approach rational basis review in equal protection cases:

[R]ational-basis review in equal protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.... Furthermore, a legislature that creates these categories need not actually articulate at any time the purpose or rationale supporting its classification. Rather, *a statutory classification ... must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.* In addition, the government has no obligation to produce

---

**10.** It seems clear from Plaintiff's complaint that he is not stating an equal protection claim based upon an age classification. After all, he is not complaining about being treated differently from ATCs 55 or younger. Instead, he is complaining about being treated differently from other ATCs who are over age 56 who are allowed to work because they fall into different retirement benefit schemes. *See* Opp., at 4. Accordingly, the Court construes the issue not as whether Congress violated equal protection by mandating retirement, but whether it violated equal protection by mandating retirement for some at one age and for others at a different age.

**11.** Plaintiff also conceded that rational basis review is proper at the hearing on this motion.

evidence to sustain the rationality of a statutory classification; [t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it. Finally, courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. *A classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality.*

*Aleman,* 217 F.3d at 1200–01 (emphasis added) (citations omitted). A court performing rational basis review should be "quite reluctant to overturn governmental action on the ground that it denies equal protection of the laws." *Vance,* 440 U.S. at 97, 99 S.Ct. 939.

The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted. Thus, we will not overturn such a statute unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational.

*Id.* (footnote omitted). Finally, the *Vance* Court cautioned that a "perfect fit" between classifications and Congressional goals is not necessary. *See id.* at 108, 99 S.Ct. 939 ("Even if the classification involved here is to some extent both underinclusive and overinclusive, and hence the line drawn by Congress is imperfect, it is nevertheless the rule that in a case like this 'perfection is by no means required.'").

▮ Plaintiff challenges the existence of different mandatory retirement ages depending upon the retirement system of which an ATC is a member. The statutory classifications are between "grandfa-thered" CSRS members (who face no mandatory retirement), non-grandfathered CSRS members (such as Plaintiff, who must retire at 56), and FERS members (who must retire at 56 or at 20 years of service, whichever is later). The burden was on Plaintiff to attack every conceivable basis for the classifications. He has not met his burden. Defendant argues that the classifications are justified because it is Congress's right to treat employees hired at different times differently for retirement purposes. Instead of refuting this, Plaintiff argues it is unfair that some PATCO strikers are allowed to work past age 56. Indeed, Plaintiff does not address (or negative) Congress's right to create different retirement ages for different employees hired at different times who are subject to different benefits calculations. The Supreme Court has upheld a system of different mandatory retirement ages based on a public employees's membership in one retirement plan versus another. *See Vance,* 440 U.S. at 109, 99 S.Ct. 939. In *Vance,* foreign service officers challenged the fact that they were required to retire at age 60 because they were covered by the Foreign Service Retirement System ("FSRS"), while employees covered by CSRS did not face mandatory retirement until age 70. *See id.* at 94–96, 99 S.Ct. 939. The Court stated that the grouping of employees in one benefit plan versus another is acceptable as a function of legislative convenience.

The Foreign Service retirement system and the Civil Service retirement system are packages of benefits, requirements, and restrictions serving many different purposes. When Congress decided to include groups of employees within one system or the other, it made its judgments in light of those amalgamations of factors.

*Id.* at 109, 99 S.Ct. 939. Similarly here, CSRS and FERS are "packages of benefits." The parties agree that an ATC's retirement and benefits plans differ significantly depending upon whether he is covered by CSRS or FERS. *See* Mot., at 4;

Opp., at 6. In other words, the different retirement age classifications are not the only differences between the plans. In addition to concerns for the stressful nature of ATC work and the safety of the public, there are numerous considerations, such as, *inter alia*, varying employment and retirement benefits, encouraging prospective employees, keeping employees in the system until they are eligible for immediate retirement,[12] as well as the expense of retirement plans. *See, e.g.,* Pub.L. 99–335, § 100A (1986) (listing purposes of FERS statute including, *inter alia*, "to assist in building a quality career work force"). For Plaintiff to successfully challenge these classifications, he must meet his burden of showing that Congress had no rational reason to create different retirement schemes under CSRS and FERS. The Court finds that he has not done so and his claim must therefore fail.[13] Moreover, for the reasons set forth above, the Court finds there is a rational basis for each of Public Laws 92–297 and 99–335.

Additionally, the Court finds Plaintiff's supplemental briefing on the FCTP to be a red herring. Plaintiff argues that the fact the FCTP hires ATCs over 56 undermines the FAA's safety rationale for the mandatory retirement scheme. The Court finds that the fact that the FCTP ATCs do not face an age limitation does not undermine the legislated mandatory retirement for FAA ATCs. First, the FCTP only operates at Level I towers, which experience a much lower volume of air traffic than the FAA operated and staffed towers. The same safety considerations do not apply to the Level I towers as apply to the Levels II–V towers staffed by FAA ATCs. Second, Defendant does not defend the classes

of mandatory retirement based on safety. Instead, he defends the classification based on Congress's right to establish different retirement schemes for employees hired at different times. The FCTP ATCs are not affected by these classifications because they are not FAA employees. Their treatment is therefore irrelevant because, as non-employees, they are not subject to (nor recipients of the benefits of) the retirement benefit plans which create the different classes of mandatory retirement.

Furthermore, the Court notes that Plaintiff did not apply for a § 8335(a) waiver properly when he wrote directly to Defendant. Plaintiff admitted as much in his letter to Defendant. *See* Compl., Ex. B. He cannot complain now about not having received a waiver when he has only himself to blame for his failure to apply properly.

Finally, the Court notes that even if Plaintiff was a member of FERS (which of course, he could have become because there were opportunities to switch plans), he would still have been retired upon his 56th birthday. It is uncontested that at the time he retired, he had worked for the FAA for over 25 years. Accordingly, even if the mandatory retirement scheme in § 8425 applied to Plaintiff, he would be in the same position as he is now—retired.

### CONCLUSION

For all of the above reasons, Defendant's motion for partial summary judgment is GRANTED.

IT IS SO ORDERED.

**12.** *See* Opp., Ex. D, at 1–2 (explaining that under FERS, an ATC will not be separated from Federal service until eligible for immediate retirement). Under CSRS, mandatory retirement may be imposed before an employee is eligible for mandatory retirement (i.e., before 20 years of service has accrued, *see* 5 U.S.C. § 8336(e)).

**13.** *See Dungan v. Slater,* No. Civ. A. 99–CV–2376, 2000 WL 218120, at *7–8 (E.D.Pa. Feb.24, 2000). Although Ninth Circuit rules

prohibit the citation of unreported cases, the Court notes that in *Dungan,* another suit against Defendant for similar claims, a district court in Pennsylvania rejected both ADEA and equal protection claims. This case is attached to Defendant's reply brief as Exhibit B. Although the Court agrees with the reasoning and outcome in *Dungan,* it reaches its decision independent of the opinion in *Dungan.*